**Lionel MALDONADO, Plaintiff,**

v.

**State of NEW JERSEY, by and through the ADMINISTRATIVE OFFICE OF THE COURTS–PROBATION DIVISION, Andrew Aman, Superintendent, in his official capacity and as an individual, Richard Mason, Assistant Superintendent, in his official capacity and as an individual, and Harry Costello, Senior Probation Officer, in his official capacity and as an individual, Defendants.**

Civ.A. No. 03–4703.

United States District Court, D. New Jersey.

Dec. 15, 2004.

David S. Hodulik, Moorestown, NJ, for Plaintiff.

Carmen R. Matos, Law Offices of Carmen R. Matos, Doylestown, PA, for Plaintiff pro hac vice.

Peter C. Harvey, Attorney General of New Jersey by Joanne Gonzalez, Deputy Attorney General, Trenton, NJ, for Defendants.

## OPINION

RODRIGUEZ, Senior District Judge.

This matter has come before the Court on Defendants' Motion for Protective Order pur-

suant to Fed.R.Civ.P. Rule 26(c), and Defendants' Motion for an Order Dismissing Plaintiff's Complaint with Prejudice, or in the alternative, Motion to Disqualify Plaintiff's Counsel. The Court has considered all papers submitted and any opposition filed herein, and for the reasons expressed below Defendants' Motion for Protective Order will be granted, and Defendants' Motion to Dismiss Plaintiff's Complaint with Prejudice will be denied. The Court, however, will grant Defendants' Motion to Disqualify Plaintiff's Counsel.

## I. BACKGROUND

### A. Procedural History

On October 7, 2003, Lionel Maldonado ("Maldonado"), a Puerto Rican Probation Officer in the Camden Vicinage, filed a civil complaint alleging employment discrimination, hostile work environment, and retaliation by his employer, State of New Jersey, Administrative Office of the Courts ("AOC"), Probation Division, and against individual defendants Superintendent Andrew Aman ("Aman"), Assistant Superintendent Richard Mason ("Mason"), and Senior Probation Officer Harry Costello ("Costello"). The present issue before the Court concerns a letter written on October 7, 2001 (hereinafter "the October 7th letter" or "letter" [1]) by Defendants Mason and Costello to their former attorney, Deputy Attorney General Karen Griffin ("DAG Griffin").

In the October 7th letter, Mason and Costello asked DAG Griffin to take further legal action on their behalf because the New Jersey Division on Civil Rights ("NJDCR") had made a finding of probable cause (hereinafter the "finding") against them.[2] The letter also provided DAG Griffin with information regarding the credibility of witnesses who were

---

1. The "letter" collectively refers to twelve (12) pages of materials. Pages 1–8 comprise a letter authored by Costello and Mason to DAG Griffin. Page 9 contains a handwritten note by Mason to DAG Griffin. Pages 10–12 are copies of annotated statutes. These documents are bate-stamped 0001–0012.

2. On August 18, 1998, Maldonado filed a complaint with the NJDCR and alleged discrimina-

tion on the basis of national origin in violation of the New Jersey Law Against Discrimination ("LAD"). On November 4, 1999, Maldonado also filed charges with the Equal Employment Opportunity Commission ("EEOC"). (See Amend. Compl. ¶ 62.) On May 16, 2001, the NJDCR found probable cause to believe Defendants discriminated against Maldonado. (Pl.'s Opp. Br., Exh. 2.)

interviewed in response to the NJDCR matter.[3] (Def.'s Mot. at 3.) Some time after October 7, 2001, this letter allegedly ended up in Maldonado's workplace mailbox, was discovered by Maldonado, and was turned over to Mr. Latimer, his attorney on the NJDCR matter. (July 7, 2004 Transcript, hereinafter "July Tr." at 13, 23.) The exact date that Maldonado discovered the letter is unknown, but it appears that it was "later in 2001." (Maldonado Cert. ¶ 19.)

On April 15, 2004, Deputy Attorney General Gonzales ("DAG Gonzales") states she first became aware that the letter was in Maldonado counsels' possession after a meeting between the parties to review the Amended Complaint.[4] As a result, on April 19, 2004, DAG Gonzales sent a letter to Maldonado's New Jersey counsel, David Hodulik ("Hodulik"), informing him that the October 7th letter was protected by attorney-client privilege and demanded the letter's return. (*See* Gonzalez Cert. ¶ 8.) Hodulik responded on April 21, 2004, stating he would not return his original copy, and demanded an *in camera* review by the Court. (Def.'s Mot., Exh. B.) Hodulik stated that the letter was part of the NJDCR file, it was bates-stamped, and was part of Plaintiff's self-executing disclosures pursuant to Fed.R.Civ.P. Rule 26. (*Id.*) Hodulik also explained that because Defendants have not yet answered the Complaint, he was not required to produce the file.[5] (*Id.*) Defendants filed a motion for Protective Order, and after a hearing on July 7, 2004, it was determined that the October

7th letter was protected by the attorney-client privilege and/or the work-product privilege. (July Tr. at 57–58.)

Nevertheless, the Court ordered the parties to submit briefs on the question on whether Defendants waived any attorney-client or work-product privilege due to the fact that the October 7th letter inexplicably ended up in Maldonado's workplace mailbox. In addition to submitting their briefs on this issue, Defendants filed a Motion to Dismiss Plaintiff's Complaint with Prejudice, or in the alternative, Disqualify Plaintiff's Counsel as a result of the conduct of Maldonado and/or his attorneys regarding the procurement, retention, and use of the October 7th letter.

### B. Disclosure of the October 7th Letter

The October 7th letter was prepared by Mason at his home on his own personal computer in response to the NJDCR finding of probable cause. (July Tr. at 45–46.) Later that day, Mason telephoned Costello to come over to his house to review the document. Costello reviewed the letter on the computer screen and suggested some changes. (*Id.* at 47.) Mason then printed out the letter, and both he and Costello signed it. (*Id.*) The following morning, Mason made three (3) copies of the letter in his workplace copy room.[6] (*Id.*) Mason went to Costello's office and gave Costello the original letter and a copy and instructed Costello to mail the original to their attorney, DAG Griffin. (*Id.*) Mason kept two copies. At the July 7th hearing, Mason testified that, at that

---

3. The October 7th letter did not mention specific witnesses by name, but did identify the recipient (DAG Griffin) and the authors (Mason and Costello). Defendants contend that this fact does not impact the usefulness of the letter because each paragraph in the letter referenced the NJDCR's finding of probable cause—both the finding and the letter had twenty-one paragraphs. The finding did use the names of each witness interviewed. (Def.'s Reply at 7.) Moreover, it explicitly stated on the letter that it was meant to be cross-referenced to the NJDCR's finding, as well as to prior confidential statements made by Costello and Mason to DAG Griffin. (*Id.*) The letter also alleged various motives on why Maldonado initiated the lawsuit. (*See* October 7th Letter at 2.)

4. In "Paragraph 93" of his Amended Complaint, it states:

On October 7, 2001, Senior Probation Officer Costello and Superintendent Mason wrote to Karen M. Griffin, State of New Jersey, Division of Law to complain about the NJDCR's finding of probable cause and attack the credibility of witnesses who corroborated the discriminatory actions of the Defendant.

(*See* Gonzalez Cert. ¶ 3.) This paragraph is identical to "Paragraph 93" in the original Complaint.

5. Defendants requested and received several extensions to file their Answer to the Amended Complaint. Consequently, Defendants did not file their Answer until April 27, 2004.

6. According to the testimony of Costello and Mason at the July 7, 2004 hearing, these were the only copies made.

time, he did not discuss or show the letter to anybody except Costello and DAG Griffin. (*Id.* at 48.) After giving Costello his copy, Mason took his two copies to his house where they have remained since October 8, 2001. (*Id.* at 50.) DAG Griffin received the letter in the mail on October 12, 2001. (*Id.* at 51.)

Costello put his copy of the letter in an orange folder in which he kept all of his papers involving the NJDCR matter. (*Id.* at 54.) Costello kept his orange folder in his home, in his briefcase, or on his office desk at work. (*Id.* at 54–55.) Other probation-related matters were stored in manilla folders. (*Id.*) As of the July 7, 2004 hearing, Costello's copy of the letter was missing. Costello testified that it was common practice for probation officers to enter other probation officer's offices. (*Id.* at 55.) Costello testified that he knew of times that Maldonado had entered his office when he was not present. (*Id.*) Maldonado did not have keys to Costello's office, yet it appears that the office doors were open most of the time. (*Id.* at 10.)

Maldonado's involvement began when the October 7th letter was allegedly found in his workplace mailbox. There has been no direct evidence offered by either party explaining how the letter appeared in Maldonado's mailbox.[7] Upon finding the letter, Maldonado noticed that the letter was addressed to DAG Griffin and signed by Costello and Mason. (July Tr. at 31–32.) Maldonado testified that he generally understood the contents of the letter, and admitted that he felt that the letter would be something favorable to his case. (*Id.* at 36.) Then, Maldonado

"immediately" produced the documents to his counsel.[8] (Maldonado Cert. ¶ 20.)

Defendants allege that they were not aware that Maldonado had the October 7th letter until April 15, 2004, when DAG Gonzales read "Paragraph 93" of the Amended Complaint during a conference with Maldonado's counsel. Defendants attempted to recover the documents from Hodulik, but when Hodulik refused, Defendants filed a Motion for Protective Order. A hearing was held on July 7, 2004, which determined that the letter was privileged. Defendants now bring forth these motions.

## II. DISCUSSION

Three discrete, but related, issues are before the Court. The first issue concerns whether Defendants waived their attorney-client and/or work-product privilege as it relates to the October 7th letter. The second issue concerns Defendants' motion to dismiss Maldonado's Complaint with prejudice because he allegedly engaged in misconduct regarding the procurement of the letter. If a dismissal of the Complaint is not warranted, the Court will then consider Defendants' motion to disqualify counsel, which is based on the alleged prejudicial effect that the contents of the letter would have on Defendants' case.

### A. Waiver of Attorney–Client/Work–Product Privilege

Separate and apart from the Motion to Dismiss Plaintiff's Complaint with Prejudice, or alternatively, Disqualify Counsel, is the issue of whether Defendants waived their

---

7. Maldonado believed that someone was trying to help him with his pending NJDCR matter by placing the letter in his mailbox. (Maldonado Cert. ¶ 19, July Tr. at 25.) Yet, Maldonado admitted at the July 7, 2004 hearing that he did not discuss the NJDCR matter with anyone. (July Tr. at 25.) Maldonado countered by stating there might have been rumors regarding his case. (*Id.*)

8. Maldonado has had numerous attorneys during this litigation. Maldonado testified that he first produced the letter to his counsel, Mr. Latimer, during the course of the NJDCR investigation and Mr. Latimer, in turn, produced the letter to NJDCR. (July Tr. at 37.) Maldonado also testified that he later provided Matos with the file

from NJDCR. (July Tr. at 35.) The exact date of when the letter came into the possession of Matos is unknown, however, it is clear that Matos, and New Jersey counsel Susan Babb, had been in possession of the letter before the filing of the original Complaint on October 3, 2003. (Def.'s Motion at 18.) On December 5, 2003, Babb was substituted by Alberto Rivas. On January 6, 2004, Rivas was substituted by Hodulik, and Hodulik and Matos signed and filed the Amended Complaint the same day. Hodulik also states that he received the letter in the NJDCR file. (Def.Br., Exh. B.) In summary, Matos signed both the original and Amended Complaint, whereas Hodulik only signed the Amended Complaint.

privilege as to the October 7th letter. Essentially, Maldonado argues that Defendants waived their privilege as to the letter because the letter was "leaked." Conversely, Defendants assert that their privilege remains intact because they took reasonable precautions to safeguard the letter.

### 1. Privilege Doctrines

■ The Federal Rules of Civil Procedure allow parties to

> [o]btain discovery regarding any matter, *not privileged*, which is relevant to the claim or defense of any party, [and] ... for good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1) (emphasis added). The attorney-client privilege and the work-product doctrine are two separate principles intended to protect litigants from unfettered disclosure. *See Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In certain circumstances these protections can be waived. Here, Plaintiff asserts that Defendants waived their privilege as to the letter.

At the July 7, 2004 Protective Order hearing the Court held that the October 7th letter is protected by the attorney-client and/or work-product privilege. (July Tr. at 57.) Each doctrine approaches the waiver issue differently; thus, each concept will be addressed in turn.

### 2. Attorney–Client Privilege

■ The privileges noted in Rule 26(b)(1) are encompassed in Rule 501 of the Federal Rules of Evidence. Rule 501 states that the application of any claimed privilege is governed by the common law, unless otherwise provided by the Constitution or other federal statute. In cases premised upon federal question jurisdiction, federal common law, rather than state law, governs the evidentiary privileges. *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 103 (3d Cir.1982); *Wei v. Bodner,* 127

F.R.D. 91, 94 (D.N.J.1989). Moreover, where, as here, there are both federal and state law claims, federal privileges rather than state privileges apply to all claims. *Wei,* 127 F.R.D. at 94. Accordingly, federal common law shall govern those claims premised upon federal question jurisdiction as well as those premised upon state law. Additionally, the party claiming the privilege has the burden of establishing that the privilege applies. *See Harding v. Dana Transport, Inc.,* 914 F.Supp. 1084, 1089–90 (D.N.J.1996) (citing cases).

■ The United States Supreme Court has recognized that the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also In re Grand Jury Investigation,* 599 F.2d 1224, 1235 (3d Cir.1979) (stating that the attorney-client privilege exists to foster disclosure and communication between the attorney and the client). No bright-line rule governs the applicability of the attorney-client privilege and, as a result, the applicability of the privilege should be determined on a case-by-case basis. *Upjohn,* 449 U.S. at 396–97, 101 S.Ct. 677. The Third Circuit has enumerated the traditional elements of the privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation*, 599 F.2d at 1233 (citation omitted). Courts have found that because the privilege obstructs the search for the truth and because its benefits are, at best, "indirect and speculative," it must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* at 1245.

It is within this context that the doctrine of waiver of the attorney-client privilege resulting from inadvertent disclosure by an attorney developed. Instructive on the issue of inadvertent disclosure is *Ciba–Geigy Corp. v. Sandoz, Ltd.*, 916 F.Supp. 404, 410–11 (D.N.J.1995). In *Ciba–Geigy*, Judge Wolfson reviewed the development of three distinct schools of thought regarding the waiver doctrine, falling along a continuum. *Id.* On one end of the continuum, the cases rest all responsibility on the attorney, holding that the inadvertent disclosure of a privileged document vitiates the privilege and constitutes waiver. *Id.* at 410. On the other end, the cases recognize the general precept that the client and not the attorney holds the privilege, and thus adopt a "no waiver" rule. *Id.* at 410–11. The third school seeks a middle ground that focuses upon the reasonableness of the steps taken to preserve the confidentiality of privileged documents. *Id.*

In this middle ground, the *Ciba–Geigy* court reasoned that general rules concerning waiver should apply equally in the inadvertent disclosure arena. The court stated that in general, a waiver must be a knowing and intentional act to be effective. *Id.* While an inadvertent disclosure is, by definition, an unintentional act, if such a disclosure results from gross negligence, courts following the third approach will deem the disclosure to be intentional, thus constituting a waiver of the privilege. *Id.* at 411. Following the modern trend, Judge Wolfson adopted this third approach and considered the following factors:

1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production;

2) the number of inadvertent disclosures;

3) the extent of the disclosure;

4) any delay and measures taken to rectify the disclosure; and

5) whether the overriding interests of justice would or would not be served by relieving the party of its error.

*Id.*

■ Merely establishing that a disclosure was unintentional does not go far in establishing the absence of waiver. Rather, the party resisting a waiver argument must demonstrate that it undertook *reasonable precautions* to avoid inadvertent disclosures of privileged documents. *Id.* at 412 (emphasis added). While the Third Circuit has not addressed which of the approaches controls, the *Ciba–Geigy* court cited to several district courts in this Circuit, as well as courts in other circuits, that have endorsed the third approach. *Id.* at 411; *see also Redland Soccer Club, Inc. v. Department of the Army*, 55 F.3d 827, 856 (3d Cir.1995) (implying that the Third Circuit would adopt a balancing test to determine whether an inadvertent disclosure constituted a waiver).

In *Ciba–Geigy*, the corporate defendant asked the court to compel the plaintiff corporation to return an internal memorandum which the in-house counsel had written and addressed to an employee of the defendant. The parties did not dispute that the memorandum was privileged. Upon review of the above factors, the court held that the relatively small size of the document production at issue, the lack of time constraints, combined with the defendant's own admission that it failed, on two occasions, to conduct any privilege review prior to producing copies of the ... document, compel a finding of waiver in this case. *Id.* at 412. The court further found that counsel's failure to conduct a privilege review in two separate instances amounted to inexcusable neglect. *Id.* Significant in the court's analysis was the fact that the parties were subject to self-imposed time constraints on themselves regarding discovery and that, although counsel quickly attempted to rectify the second disclosure, the disclosure would not have occurred if counsel had initially implemented an appropriate review process. *Id.* at 414.

Here, the parties' briefs apply the *Ciba–Geigy* factors (an inadvertent disclosure case) to the facts of this case (an involuntary dis-

closure case). Defendants argue alternatively that the issue of waiver is different in an involuntary disclosure case, than in an inadvertent disclosure case; essentially, Defendants argue that the possibility of waiver is higher in an inadvertent disclosure case because it involves unilateral errors by the party asserting the privilege i.e. carelessly placing a privileged document in a box of discovery documents and delivering them to the other side. Thus, Defendants define an involuntary disclosure as an occurrence when the privileged information inexplicitly ends up in the other side's hands. This distinction, while helpful in determining the degree of fault attributed to the attorney who caused the disclosure, is not particularly useful in ascertaining the prejudice to the privilege holder's case.

■ Because the impact to the privilege holder's case is the same regardless of the manner of disclosure, the *Ciba–Geigy* factors would work equally well in an involuntary disclosure case. Moreover, given the modern trend that applies a case-by-case analysis to the waiver determination, it is appropriate that these factors be applied to this case. *See Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir.1993) (using these factors and favoring the modern trend, instead of rigid waiver rules, and opting instead for an approach which takes into account the facts surrounding a particular disclosure).

### (i) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production

The first factor, the reasonableness of the precautions taken to prevent disclosure, weighs in favor of finding no waiver. The record provides ample evidence that Mason and Costello, the privilege holders, took all reasonable precautions to safeguard the October 7th letter. Furthermore, there is no indication that either Mason, Costello, or DAG Griffin were responsible for the disclosure of the letter. It does appear that the letter was taken from Costello's office; yet, it was taken from an orange folder that was specially designated for the NJDCR case. This is noteworthy because this folder was distinct from the other manilla-colored work folders used for probation related matters, and therefore, demonstrates a modicum of precaution on Costello's part.

■ Costello's handling of the letter was not perfect, nevertheless, he took reasonable precautions to avoid disclosure of the letter. Persuasive precedent from other jurisdictions support the determination that the attorney-client privilege can remain intact despite a one-time leak of privileged information.[9]

### (ii) The number of inadvertent disclosures

The second factor concerns the number of inadvertent disclosures. This factor also supports Defendants because there was just one disclosure, and it was not inadvertent, but rather, unexplainable. Furthermore, it has been certified by Costello, Mason, and DAG Griffin, that all remaining copies had not been disclosed, or discussed until it became known that a copy was disclosed. Unlike *Ciba–Geigy*, where there were two inadvertent disclosures, this case presents a one-time leak situation. Thus, this factor weighs against a finding of waiver.

### (iii) The extent of the disclosure

The third factor, regarding the extent of the disclosure, also supports Defendants' argument. The October 7th letter was a point-by-point response, written by Defendants Mason and Costello, addressing alleged inaccuracies in the NJDCR finding of probable cause and attacking the credibility of witnesses who gave statements on Maldonado's behalf. Furthermore, the letter posits al-

---

9. *See In re Grand Jury Proceedings Involving Berkley & Co., Inc.*, 466 F.Supp. 863, 869 (D.Minn.1979) (holding that a terminated employee who kept privileged documents of employer did not constitute a waiver); *In re Dayco Corp. Derivative Securities Litig.*, 102 F.R.D. 468 (S.D.Ohio 1984) (holding that a reporter who received an incriminating diary from an unknown source did not constitute a waiver); *Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358 (S.D.N.Y.1997) (disallowing the deposition testimony of an expert who formulated his opinion on a stolen memo which was made public by defendant's employee).

leged motives that Maldonado had in bringing this lawsuit. Essentially, the letter was a blue-print to Defendants' thought processes and trial strategy. The disclosure was complete, as the letter was identified in the initial and Amended Complaints.

### (iv) Delay and measures taken to rectify the disclosure

The fourth factor considers the delay and measures taken to rectify the disclosure by the privilege holder. In support of Defendants' Motion to Disqualify Counsel, they argue that counsel had the letter since filing the original Complaint. However, this factor presents somewhat of a double-edged sword because it could also be argued that Defendants knew that opposing counsel had the letter since October 3, 2003, the filing date of the original Complaint, yet did nothing to rectify the disclosure. After all, it was not until the Amended Complaint was reviewed on April 15, 2004, that Defendants first notified Hodulik of the disclosure.

A strong argument can be made, even though it was not proffered by Maldonado, that Defendants are charged with this knowledge on October 3, 2003, because "Paragraph 93" in the initial Complaint is identical to "Paragraph 93" in the Amended Complaint. Therefore, Defendants were put on notice seven and a half months before the April 15, 2004 meeting. Defendants do assert that after reading the Amended Complaint, they promptly filed a Motion for a Protective Order twenty-three days later. (Mot. for Protect. Or. at 20.) However, at the November 16, 2004 hearing it was revealed that Defendants were not afforded counsel from the Attorney General's office until sometime in March 2004.[10] These facts considerably weakens the allegation of delay against the Defendants since DAG Gonzales has a plausible excuse for her delay and her response to Hodulik was timely. Nevertheless, the fact remains that notice of the letter's disclosure

was conspicuously present on the Complaint for over seven months; or, at the very least, DAG Gonzales knew for over two months since she filed for an extension in February 2004. Therefore, both parties had a hand in the delay and this factor will be held to be neutral.

### (v) Whether the overriding interests of justice would or would not be served by relieving the party of its error

The final factor considers whether the overriding interests of justice would or would not be served by relieving the party of its error. Here, the difference between inadvertence and involuntariness is critical. It will be determined in Part II.B, *infra*, that misconduct cannot be attributed to Maldonado; however, there does exist sufficient grounds to disqualify counsel because they failed to timely notify opposing counsel of the letter, and the disclosure resulted in substantial prejudice to Defendant's case, *see infra* Part II.C. Given these concurrent determinations, and the facts of this case, it would be entirely inconsistent to disqualify counsel, and then hold that Defendants waived their privilege, or vice versa. Accordingly, it cannot be in the interest of justice to punish Defendants since they took reasonable precautions to protect the dissemination of the letter.

■ Therefore, based upon the weight of these factors, it is determined that Defendants did not waive their attorney-client privilege.

### 3. Work–Product Privilege

■ The work-product doctrine provides an independent ground upon which litigants may rely for protection of attorney materials prepared for trial. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The purposes behind the work-product doctrine differ from those underlying the attorney-client privilege. The attorney-

---

10. The court specifically asked DAG Gonzales about the delay during the November 16, 2004 hearing. (*See* Transcript of Nov. 16, 2004 hearing, hereinafter "Nov. Tr." at 9–10.) DAG Gonzales stated that she did not meet with the Defendants, and therefore, actually read the Complaint until it came time to Answer the Amended Com-

plaint in late March. *Id.* However, Matos pointed out that DAG Gonzales asked the Court for an extension to Answer the Amended Complaint in February 2004. *Id.* at 22. Therefore, DAG Gonzales is charged with knowledge of the disclosure in February 2004.

client privilege protects communications between clients and their attorneys, thus encouraging an open dialogue. *See Harding v. Dana Transport, Inc.,* 914 F.Supp. 1084, 1097 (D.N.J.1996). In contrast, the work-product doctrine is broader and maintains legal professionalism by precluding attorneys from capitalizing on an adversary's work efforts. *Hickman,* 329 U.S. at 511, 67 S.Ct. 385; *see also In re Grand Jury (Impounded),* 138 F.3d 978, 981 (3d Cir.1998). This doctrine has been codified as to tangible items, such as letters, in Rule 26(b)(3), Fed. R.Civ.P. *Id.* It is well-settled that the work-product privilege is aimed at protecting the legal theories developed by counsel in preparation for litigation. *Id.*

The Supreme Court has stated that work-product remains protected even after the termination of the litigation for which it was prepared. *FTC v. Grolier, Inc.,* 462 U.S. 19, 25, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983). Most courts adhere to this concept and have ruled that the work-product doctrine does extend to subsequent litigation. The rationale is that Rule 26, which governs discovery, does not explicitly confine the privilege to the litigation in which it is sought. *Frontier Ref. v. Gorman–Rupp Co.,* 136 F.3d 695, 703 (10th Cir.1998).

In *In re Grand Jury Proceedings,* 604 F.2d 798, 803–04 (3d Cir.1979), the Third Circuit stated, in dicta, that the doctrine should only apply to subsequent litigation which is "closely related." In that case, the court held that all documents produced in connection with an administrative proceeding were subject to work-product privilege even though they may not have been specifically prepared in connection with the subsequent grand jury investigation in which they were sought. Lest there be any question, it is held that the October 7th letter written by Costello and Mason to DAG Griffin, in response to the NJDCR finding of probable cause, continues as work-product for this closely related litigation in district court. Hence, Maldonado's claim that the letter's value is somehow lessened because it was not prepared for litigation before this Court is without merit.

The predicate of the waiver inquiry in the work-product context is not, as it is in the attorney-client context, whether the material was disclosed, but whether the material was disclosed to an adversary. In *United States v. American Tel. & Tel. Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980) it was concluded:

> The work-product privilege does not exist to protect a confidential relationship, but rather to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent. *The purpose of the work-product doctrine is to protect information against opposing parties,* rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation. . . . We conclude, then that while the mere showing of voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work-product privilege.

*Id.* (emphasis added).

Therefore, inadvertent or even intentional disclosure of work-product documents will not necessarily constitute waiver to all such documents. *See Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1222 (4th Cir.1976) (holding that broad concepts of the subject matter waiver analogous to those applicable to claims of attorney-client privilege are inappropriate when applied to Rule 26(b)(3)); *In re F.A. Potts & Co.,* 30 B.R. 708, 711–12 (Bankr.E.D.Pa.1983) (reasoning a letter that was written in anticipation of litigation, yet disclosed to an unrelated third party, did not constitute waiver because the purpose of the doctrine is to protect material from adversaries and not necessarily from the rest of the world). Thus, a waiver of the work-product privilege is a much tougher feat than a waiver of the attorney-client privilege.

The essential question with respect to waiver of the work-product privilege by disclosure is whether the material has been kept away from adversaries. *Nicholas v. Wyndham Int'l, Inc.,* 2003 WL 23198845 at *3–4, 2003 U.S. Dist. LEXIS 24086 at *9 (D.V.I.2003). The protection is retained

when there has been disclosure to persons with a common interest, to persons in the course of a business relationship, and to the government. In all cases, the focus of the inquiry is on the extent to which the relationship is an adversarial one and the 'efforts made to keep adversaries from obtaining material. As stated in *United States v. American Tel. & Tel. Co.*, "Waiver would occur . . . only if the disclosure 'substantially increases' the possibility of an opposing party obtaining the information. . . ." 642 F.2d at 1299; *see also Hatco Corp. v. W.R. Grace & Co.*, 1991 WL 83126 at *7 (D.N.J. May 10, 1991).

The work-product doctrine protects information from opposing parties, rather than from all others outside a particular confidential relationship. Before reaching the analysis, it should be mentioned that the party asserting waiver of work-product immunity, rather than the party asserting the work-product protection, has the burden of establishing waiver. *Nicholas*, 2003 WL 23198845 at *4, 2003 U.S. Dist. LEXIS 24086 at *10; *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC.*, 202 F.R.D. 418, 423 (E.D.Pa.2001). Therefore, Maldonado has the burden of showing that Defendants waived the work-product privilege regarding the October 7th letter.

Maldonado has failed to meet his burden for several reasons. First, the purpose of the work-product doctrine is to encourage an attorney to prepare effectively for litigation. It would be consistent with the purpose of the work-product protection to encourage Defendants such as Costello and Mason to prepare a letter, attacking the evidence supporting the NJDCR's finding of probable cause, in anticipation of future litigation in district court. It would completely stand the work-product doctrine on its head to allow discovery of an attorney's work-product simply because that letter inexplicably found its way into the adversary's hands.

Second, based upon the standard set forth in the *AT & T* case above, Defendants have not waived the work-product privilege because their conduct did not "substantially increase" the possibility of an opposing party obtaining the information. Only three copies of the letter were made and they were all accounted for. The record also indicates that the subject of the letter was kept confidential. Even assuming that Defendants somehow waived the attorney-client privilege, the precedent uniformly supports the determination that a leak situation, such as the case here, would not constitute a waiver of the work-product privilege.

For these reasons, Defendants did not waive either the attorney-client privilege or work-product privileges.

### B. Motion to Dismiss Complaint with Prejudice

Defendants maintain that as a result of Maldonado's and/or his attorneys' misconduct, Defendants' right to a fair trial has been abridged. Defendants assert that dismissal of this case is the only viable sanction to redress Maldonado's conduct, and unless Plaintiff's actions are sanctioned, the entire proceeding will be irreparably tainted. Both parties rely on *Perna v. Electronic Data Corp.*, 916 F.Supp. 388 (D.N.J.1995) as persuasive precedent for this issue. Not finding Third Circuit precedent on this issue, Judge Rosen surveyed the caselaw in all the circuit courts of appeal and adopted a six-factor test to determine when a case should be dismissed with prejudice for client misconduct. Not surprisingly, each party claims that the *Perna* factors weigh in their favor. Before applying these factors to this case, some background is necessary.

Defendants' Motion to Dismiss is not grounded on any specific rule, but rather the Court's inherent power to supervise and sanction parties in order to achieve the orderly and expeditious disposition of cases. The Supreme Court has recognized that dismissals with prejudice or defaults are drastic sanctions. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *see also Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 868 (3rd Cir.1984) (calling the sanction of dismissal "extreme"). Nevertheless, the Supreme Court has also recognized that a court's inherent power is a reasonable means and an acceptable ground to dismiss an action where appropriate. *Roadway Ex-*

*press, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

Accordingly, the Supreme Court has stated, "It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed within a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1990). The judiciary must retain such authority to redress wrongs and uphold justice. *Id.* Further, the Supreme Court has announced, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Id.*

Nevertheless, because of their potency, inherent powers must be exercised with restraint and discretion. *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. *Roadway Express,* 447 U.S. at 764, 100 S.Ct. 2455. Dismissal, therefore, is the most severe sanction a court can levy against a party. It is justified under a court's inherent power in extreme circumstances, in response to abusive litigation practices, and to insure the orderly administration of justice and the integrity of the court's order. *See, e.g., Halaco Engineering Co. v. Costle,* 843 F.2d 376 (9th Cir.1988); *Kenney v. California Tanker Company,* 381 F.2d 775 (3d Cir.1967).

It is with these principles in mind that the six-factor test was adopted by the *Perna* court as a method for determining when the sanction of dismissal is warranted. The factors are as follows:

(1) the existence of certain extraordinary circumstances;

(2) the presence of willfulness, bad faith, or fault by the offending party;

(3) the consideration of lesser sanctions to rectify the wrong and to deter similar conduct in the future;

(4) the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case;

(5) prejudice and the public interest; and,

(6) the degree of the wrongdoer's culpability.

*Perna,* 916 F.Supp. at 398. The misconduct in *Perna* occurred when the parties were engaged in document inspection conducted at the plaintiff's office. During a lunch break, defendant's attorneys left three briefcases containing documents described as "work-product" containing counsel's mental impressions and strategy for the preparation of the case for trial. The plaintiff, surreptitiously, went into the briefcase, and photocopied these documents, turning them over to his counsel. In dismissing Perna's claim, the court held that his activities were "deliberate, willful, and intentional acts ... to gain unauthorized access to his adversary's documents." *Id.* at 403. In reaching that result, the court employed the six-factor test above. These factors will now be applied to the facts of the case.

### 1. Existence of certain extraordinary circumstances

This factor was used in *Perna* to demonstrate the client's education and experience around attorney work-product, as well as the overall circumstances surrounding the client's conduct. In *Perna,* the client was a sophisticated business man, who had been involved in previous lawsuits. *Id.* at 399. The court determined that Perna's clandestine behavior of browsing through and photocopying the documents, knowing that the documents belonged to his adversaries, and having his partner serve as a lookout was an unthinkable and extraordinary act. *Id.* The court noted that, at the very least, Mr. Perna knew his conduct was wrong. *Id.*

Defendants assert that Maldonado, like Perna, is similarly experienced because he is a college-educated, Senior Probation officer, who regularly appeared in court. (July Tr. at 7). Defendants contend that Maldonado understood what the letter was when he first viewed it, and engaged in misconduct when he gave the letter to his attorney, rather than the addressee. (Pl. Opp. Br. at 11.)

Such legal sophistication, however, cannot be imputed to Maldonado merely because he has a law enforcement background. Unlike *Perna*, there is no testimony or admissions from the July 7, 2004 hearing that shed light on whether Maldonado truly appreciated the contents of the letter, or more importantly, the impropriety of his conduct. The transcript indicates that Maldonado was confused and ignorant about what he should do with the letter. Maldonado cannot be qualified as a layperson as his counsel argues (Pl. Opp. Br. at 11); Maldonado certainly knew that the contents of the letter were useful to his case, but he appears unaware of any ethical issues concerning the continued possession of the letter. Maldonado's conduct, as comparable to Perna's conduct, is distinguishable and will be elaborated on under the next factor.

**2. The presence of willfulness**

The willfulness and bad faith in *Perna* was readily apparent; whereas, here it is not. Even though the initial discovery of the work-product was inadvertent (the contents of the briefcase had fallen out), Perna knowingly and intentionally made copies and had his business partner serve as a lookout. *Perna*, 916 F.Supp. at 399. By his own words, Perna became desperate and would do whatever act he could to prevail in his case. *Id.* Perna stated, "I was protecting my interests, your Honor, I felt—actually what I felt was at the time, if you want to know my emotional state, I felt that the whole—the walls were caving in." *Id.* The *Perna* court reasoned, "Although Mr. Perna may not have initially harbored an intent to rifle through the defendant's documents when he entered the office, once he saw the documents, his actions were clearly intentional." *Id.* at 400. "This is not a situation," the court stated, "where Mr. Perna inadvertently stumbled upon the documents and immediately informed his attorney that he may have mistakenly gained access to the defenses materials." *Id.*

Here, Defendants argue that all credible circumstantial evidence points to the inescapable conclusion that Maldonado took the letter for his own self-serving purposes. (Def.'s Mot. at 8.) Defendants reach that conclusion because it is alleged that only Mason, Costello, and DAG Griffin were in possession, and had knowledge, of the letter. Further, it was admitted by Maldonado that he had access to Costello's office, and on previous occasions had entered Costello's office. Thus, because it is allegedly Costello's copy of the October 7th letter that was misappropriated, Defendants urge the court to conclude that Maldonado took the letter. Undoubtedly, these circumstances are suspicious; yet, in order to make a determination of willfulness and bad faith there has to be more than mere innuendo showing that Maldonado intentionally took the letter. Defendants have not proffered any direct evidence that Maldonado intentionally took the letter, nor can such evidence be gleaned from the July 7th transcript. Thus, a determination cannot be made regarding Maldonado's role, if any, in the misappropriation of the letter.

The critical issue is whether after the letter was discovered, did Maldonado's conduct constitute a "willful and improper design to avoid the rules of discovery and gain an unpermitted advantage in his litigation." *Perna*, 916 F.Supp. at 400. Maldonado testified that once the documents were discovered, he immediately sent them to his attorney, who in turn submitted them to NJDCR. (July Tr. at 15.) Defendants argue that Maldonado read the letter, became aware of its contents, and then realizing it was helpful to his case, provided it to his attorney in the NJDCR matter. (Def.'s Motion at 8.) Even assuming that Defendants' version of events is true, this conduct alone would not warrant dismissal.

Maldonado's conduct is distinguishable from *Perna*. In *Perna*, the client was in the same room as his adversary's attorney, made copies of the work-product, and posted a lookout to accomplish this deed. The client stated that his intentions "were to find out how [Defendant] was trying to deceive [him]." *Perna*, 916 F.Supp. at 400. In contrast, and without any direct evidence to the contrary, Maldonado realized that the letter might be helpful to his case and simply gave the document to his attorney. (July Tr. at 35–36.) There is little doubt that Maldonado understood the purpose letter; however, his

conduct falls short of willful and deliberate bad faith which was shown by the litigation-savvy Perna. Maldonado gave the letter to his attorney because he was his "legal advisor" and he did not know what to otherwise do with the letter. (July Tr. at 36.)

Here, there was seemingly client ignorance, but in *Perna* there was a knowing and deliberate client. This case presents the hypothetical case that was distinguished by the *Perna* court; namely, a situation where a client inadvertently stumbled upon the documents and immediately informed his attorney that he may have mistakenly gained access to defenses materials. This case is that scenario, and accordingly, there is no wilfulness. Therefore, this factor does not support a dismissal of the Complaint.

### 3. Consideration of lesser sanction to rectify the wrong and to deter similar conduct in the future

The sanction of dismissal is generally reserved for those extreme circumstances where deception is willful and the act was inconsistent with the orderly administration of justice. *Perna*, 916 F.Supp. at 400. Unlike the client in *Perna*, Maldonado's actions were not willful. The party's conduct is the threshold issue for the sanction of dismissal; therefore, it need not be determined if there is any lesser sanction that would deter Maldonado's future conduct. Defendants have alternatively moved for a disqualification of Maldonado's counsel. The sufficiency of that lesser sanction, as it relates to the conduct of Maldonado's counsel, will be addressed in Part II.C, *infra*.

### 4. The relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case

A consideration for the imposition of a dismissal sanction is that the misconduct penalized has to relate to matters in controversy in such a way as to interfere with the rightful decision of the case. *Perna*, 916 F.Supp. at 400. The *Perna* court explained this nexus in the following way:

It is the general abuse of the discovery process being conducted under the authori-ty of this court and the ability to punish the perpetration of fraud upon the court that must be sanctioned. It is not necessary to demonstrate that the purloined letter was relevant to this lawsuit. *Rather, it is the conduct that must be recognized as an interference with the judicial process and the orderly and fair administration of justice.*

*Id.* (emphasis added).

Accordingly, there has to be a nexus between Maldonado's conduct and the merits of his case. Thus, the substance of what was viewed is not the crucial issue in determining whether or not sanctions should be imposed. *Id.* Rather, it is Maldonado's conduct that may be sanctioned, not the substance of the privileged or otherwise protected documents. Unlike *Perna*, Maldonado's conduct does not rise to the level deliberate or willful indifference that must be sanctioned to preserve the integrity of the litigation process.

Maldonado's conduct after the letter was discovered cannot be characterized as a willful, deliberate, and intentional act that was meant to interfere with the judicial process. Defendants' sole argument in favor of dismissal is that the misconduct was the taking of the letter, presumably out of Costello's office. Because it has already been determined that this misconduct has not been proven, a dismissal sanction is not warranted.

### 5. Prejudice and public interest

The *Perna* court realized that the existence and degree of prejudice to the wronged party and to the public interest is a serious consideration. *Id.* In certain instances, the prejudice to the litigation process is presumed because it is impossible to gauge the amount of actual damage. The purpose of the dismissal sanction, therefore, is to deter and punish the litigant, and future litigants, from abusing this process. *Id.* It was determined by the court that Perna's conduct rose to the level to satisfy the prejudice and public interest prong.

In contrast to *Perna*, the conduct at issue here involves Maldonado finding the letter in his workplace mailbox, reviewing it, and then handing it over to his attorney. Admittedly,

prejudice exists due to significance of the letter's contents; however, Maldonado's conduct falls short of the sanctionable conduct in *Perna* because there is no evidence that Maldonado committed a deliberate or bad faith act. Thus, the deterrent effect of the dismissal sanction is not present. Naturally, the proper thing to do when he received a letter that was not addressed to him was to return it to the named recipient or author. Instead, given the alleged environment at work and Maldonado's level of legal understanding, he gave the letter to his attorney. Maldonado's attorney is the safety-net in this situation, and is charged with certain ethical obligations as it relates to the privileged materials.[11]

### 6. Degree of wrongdoer's culpability

In *Perna*, the client's conduct was extraordinary and his conduct was willful and in bad faith because he gained unauthorized access to privileged materials. *Id.* at 402. As discussed above, there is no equivalent conduct presented here.

■ Consequently, for the reasons set forth above, Defendants' Motion to Dismiss Plaintiff's Complaint with Prejudice based upon Maldonado's alleged misconduct will be denied.

### C. Disqualification of Plaintiff's Counsel

If the dismissal sanction is not warranted, Defendants urge the court to disqualify Maldonado's counsel because there was unauthorized retention of Defendants' privileged information, that will result in substantial prejudice to their case. The submissions to the Court on this issue correctly point out that there is no controlling precedent that determines whether counsel should be dis-

qualified given the facts of this case. There is, however, ample persuasive authority to guide the analysis and reach a conclusion on this issue.

■ Defendants are specifically seeking to disqualify Ms. Matos, who was admitted to appear *pro hac vice* by this Court's Order dated May 13, 2004. Should Matos be disqualified, Defendants urge the Court that Mr. Hodulik should also be disqualified by implication. (Def. Mot. at 1.) Defendants argue that this result would be appropriate based upon the *pro hac vice* Order, which states that Hodulik "shall be held responsible for said papers and for the conduct of the case and who shall be present before the court during all phases of this proceeding . . . as well as be responsible for the conduct of the attorney admitted *pro hac vice*." (May 13, 2004 Order at 2.) Despite Defendant's argument to the contrary, a *per se* rule disqualifying local counsel based on the out-of-state attorney's conduct is not justified. Instead, it is more appropriate to evaluate each attorney's conduct independently.

■ Here, however, both counsels were equally involved in the handling of the letter. Matos' involvement in the case began much earlier than Hodulik since she signed the initial Complaint on October 7, 2003. However, both Hodulik and Matos certified and filed the Amended Complaint in January 2004. Moreover, the submitted correspondence between the parties indicate that Hodulik was involved as much as Matos in the controversy surrounding the letter. Thus, it is appropriate to consider both attorneys in Defendants' Motion to Disqualify Counsel.

### 1. Standard of Review for Motion to Disqualify

■ It is well settled that because motions to disqualify can have such drastic

---

11. Again, the *Perna* case is about client misconduct. Nevertheless, the court found that despite the client's sanctionable conduct, the conduct of his counsel "should be applauded." *Id.* at 402. Once the misconduct became known, the attorney contacted and sought an opinion from the New Jersey Supreme Court Advisory Committee on Professional Ethics. The Committee ruled "that counsel for plaintiffs was required to disclose to counsel for [defendant] that the contents of their briefcases may have been reviewed by

plaintiffs during the document inspection and that copies of the contents thereof may or may not have been copied." Accordingly, on the advice of the New Jersey Supreme Court Advisory Committee on Professional Ethics, counsel for the plaintiffs' advised the court and defense counsel of the facts surrounding plaintiffs' counsel inquiry brought before the Ethics Committee. *Id.* at 393. Maldonado's counsels' conduct will be distinguished in Part II.C, *infra*.

consequences, courts disfavor such motions and grant them only when absolutely necessary. *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993) (citing *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983)). Nevertheless, in disqualification situations, any doubt is to be resolved in favor of disqualification. *Hull v. Celanese Corporation*, 513 F.2d 568, 571 (2d Cir.1975); *see also Kaselaan & D'Angelo Assoc., Inc. v. D'Angelo*, 144 F.R.D. 235, 238 (D.N.J.1992) (movant therefore bears the burden of proving that disqualification is appropriate either because the New Jersey Rules of Professional Conduct are violated or because sufficient doubt exists as to the propriety of representation). It is clear why this presumption arises when an adversary's confidences are passed to the opposing attorney. There is an inherent difficulty in determining, at some later time, whether the disclosure occurred. Self-serving affidavits of counsel and others are not helpful because of their undeniable interest in preserving any tactical advantage they may have garnered. *MMR/Wallace Power & Industrial, Inc. v. Thames Associates*, 764 F.Supp. 712, 726–27 (D.Conn.1991).[12]

 Federal courts have the authority to discipline attorneys appearing before them for conduct deemed inconsistent with ethical standards. *See In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985). Furthermore, New Jersey law governs the analysis of attorney conduct before this Court.[13] In considering disqualification, courts must be mindful that the interests of the clients are primary, and the interests of the lawyers are secondary. *Oxford Systems, Inc. v. CellPro, Inc.*, 45 F.Supp.2d 1055, 1066 (W.D.Wash.1999) (citing *Haagen–Dazs Co., Inc. v. Perche No!*

*Gelato, Inc.*, 639 F.Supp. 282, 286 (N.D.Cal. 1986)).

### 2. The Parties' Arguments

The Defendants submit the case of *MMR/Wallace* as persuasive authority to govern the analysis of the facts of this case. In *MMR/Wallace*, the plaintiff moved to disqualify defense counsel because counsel made unauthorized *ex parte* contact with a former employee of the plaintiff who had been a member of their litigation team. The court adopted a three-part analysis: 1) did the ex-employee have confidential information pertaining to plaintiff's trial preparation and strategy?; 2) did he disclose it to defense counsel?; and 3) if he did disclose it, does counsel's continued representation of defendant threaten to taint all further proceedings? *Id.* at 724. The court determined that the defense counsel's conduct can hardly be said to demonstrate a cautious regard for the disciplinary rules. *Id.* at 727. "At the very least," the court stated, "defense counsel should have contacted Plaintiff's counsel to find out what their relationship was with the ex-employee before offering him a consulting contract." *Id.* Although the court was reluctant to disqualify counsel, it concluded that the attorney's conduct appears to be one of those unusual situations where the appearance of impropriety is clearly sufficient to warrant so drastic a remedy. *Id.* at 728. Here, even though Defendants make considerable efforts to apply the *MMR/Wallace* three-part test to the facts of this case, it is determined that this test is best suited to cases involving *ex parte* contact by an attorney with an adversary's employee. Such conduct is not at issue here.

---

12. It is for these reasons that the Court ordered a hearing on November 16, 2004 to better ascertain the handling of the letter by the various attorneys and determine the extent of the prejudice to Defendants' case.

13. Under the local rules of this court, the American Bar Association's Model Rules of Professional Conduct ("RPC"), as modified and adopted by the New Jersey Supreme Court, govern the ethical conduct of attorneys in this Court. Rule 6A, General Rules of the United States District Court for the District of New Jersey. This rule, amended in 1989, "makes it clear that the ethical rules and constraints imposed on federal practitioners in New Jersey are the same as those imposed on New Jersey attorneys generally by the state Supreme Court under New Jersey Court Rule 1:14." Allyn Z. Lite, New Jersey Federal Practice Rules 34 (1995 ed.); *see Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1113–14 (D.N.J.1993); *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*, 144 F.R.D. 235, 243 (D.N.J. 1992); *Bagdan v. Beck*, 140 F.R.D. 650 (D.N.J. 1991).

More on point is the test articulated in *Richards v. Jain*, 168 F.Supp.2d 1195 (W.D.Wash.2001), which is based upon the actions taken by an attorney who inadvertently received privileged information from opposing counsel. In *Richards*, the court held that an attorney who receives privileged documents has an ethical duty to cease review of the documents, notify the privilege holder, and return the documents. *Id.* at 1200–01 (citing ABA Comm. on Ethics and Professional Responsibility, Formal Op. 94–382 (1994)). The ABA Committee held that the "cease, notify, and return" protocol is the rule even ·if there is no pending litigation. Formal Opinion 94–382 states in pertinent part:

> When an attorney receives, unauthorized, an adverse party's materials, once the attorney becomes aware of the privileged or confidential nature of the materials, the attorney must refrain from viewing such materials. The attorney can, however, review the materials to the extent necessary to determine the manner in which to proceed. The attorney should either notify opposing counsel, and follow such counsel's instructions regarding the disposition of the material, or should completely refrain from using the materials until a court makes a determination as to their proper disposition.

*Id.* Numerous jurisdictions have held that a failure by an attorney to abide by this rule is grounds for disqualification.[14]

The New Jersey Rules of Professional Conduct also subscribe to the "cease, notify, and return" steps as appropriate ethical conduct. In *Perna*, it was held in dicta that counsel's conduct of immediately informing the other side that he was in possession of the adversary's confidential documents was the only appropriate course of conduct. *Perna*, 916 F.Supp. at 400; *see also supra* note 11. The *Perna* attorney actually contacted the New Jersey Supreme Court Advisory Committee on Professional Ethics ("Advisory Committee") for advice concerning his receipt of wrongfully obtained documents. The Advisory Committee determined that had the attorney committed the acts ascribed to the client (copying the adversary's work-product), it would have constituted a violation of N.J. R.P.C. 4.4, which prohibits lawyers from using methods of obtaining evidence that violate the legal rights of a [third] person. *See* New Jersey Supreme Court Advisory Committee on Professional Ethics Opinion 680, 139 N.J. L.J. 240, January 16, 1995.[15]

Additionally, the Advisory Committee stated that it is well established that an attorney may not do indirectly that which is prohibited directly (*see* R.P.C. 8.4(a)), and consequently the lawyer cannot be involved in the subsequent review of evidence obtained improperly by the client. *Id.* The Advisory Committee reasoned:

> For a lawyer to allow a client's actions taken in the context of litigation to benefit that client in such litigation would constitute conduct that is prejudicial to the administration of justice under R.P.C. 8.4(d). Only disclosure to the adversary will avoid the prejudicial effect proscribed by this rule. . . . Mere withdrawal from representation, without disclosure, will not reverse the prejudicial conduct.

*Id.*[16]

It should be noted that the Court is not relying on the opinions of ABA or the New

**14.** *See Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1049 (9th Cir. 1985) (holding that the appearance of professional impropriety can be a sufficient ground for disqualification); *Milford Power Ltd. P'ship v. New England Power Co.*, 896 F.Supp. 53, 58 (D.Mass.1995); *Williams v. Trans World Airlines, Inc.*, 588 F.Supp. 1037, 1045 (W.D.Mo.1984) (stating "the potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process"); *In re Meador*, 968 S.W.2d 346, 350 (Tex.Sup.Ct. 1998) (failing to comply with ABA Formal Op. 94–382 may require disqualification).

**15.** RPC 4.4, Respect for the Rights of Third Parties, states:

> In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person. N.J. R.P.C. 4.4.

**16.** RPC 8.4(d), Misconduct, states that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." N.J. R.P.C. 8.4(d).

Jersey Ethics Committees as precedent. Nevertheless, two areas of concern can be gleaned from the ethics rules and opinions on this subject. First, there is a focus on the attorney conduct itself; that is, adherence to the "cease, notify, and return" requirement. Second, there is an emphasis on the effects of the conduct; namely, whether the conduct is prejudicial to the administration of justice. It stands to reason that a district court deciding a motion to disqualify counsel, on a substantive case pending before it, is most concerned with the second issue. Yet, an attorney that fails to comply with the "cease, notify, and return" protocol is also more likely to create a situation that is prejudicial to the administration of justice. It is logical and appropriate, then, that the *Richards* court developed a six-factor test that neatly incorporates both of these paradigms as elements to be weighed in evaluating a motion to disqualify.

### 3. Motion to Disqualify Factors

The *Richards* factors are as follows: 1) whether the attorney knew or should have known that the material was privileged;

2) the promptness with which the attorney notifies the opposing side that he or she has received its privileged information;

3) the extent to which the attorney reviews and digests the privileged information;

4) the significance of the privileged information; i.e., the extent to which its disclosure may prejudice the movant's claim or defense, and the extent to which return of the documents will mitigate that prejudice;

5) the extent to which movant may be at fault for the unauthorized disclosure;

6) the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney.

*Richards,* 168 F.Supp.2d at 1205. These factors will now be applied to facts of this case.

### (i) Whether the attorney knew or should have known that the material was privileged

The first factor, whether the attorney knew or should have known that the material was privileged, weighs heavily in favor of disqualification. In *Richards,* this factor was easy to decide because the files had the markings of "Privileged," "Confidential," or "Attorney–Client Privileged." The October 7th Letter was not so marked. Nevertheless, a letter signed· by two named Defendants and addressed to their attorney regarding information relevant to pending or future litigation is equally conspicuous to the eyes of an attorney.

Hodulik and Matos assert that they were unaware that the document was privileged because it was contained in the NJDCR file.[17] (*See* Pl. Opp. at 19.) The letter was specifically referenced in the Complaint and the Amended Complaint that was certified and filed by Matos and Hodulik. Further, given Matos' extensive experience in these matters, as submitted in her motion for *pro hac vice* admission, there is no question that there was knowledge on her part after receiving the NJDCR file, disseminating the file's contents, and citing to the letter in the Complaint. The privileged nature of the letter is clear on its face and both attorneys are charged with the knowledge of that fact.

### (ii) The promptness with which the attorney notifies the opposing side

The second factor concerns the promptness with which the attorney notifies the opposing side that he has received its privileged information. Plaintiffs never explicitly notified defense counsel that they were in possession of privileged materials and made no attempt to either return the materials or cease review upon notice of possession. Only when it was discovered by Defendants that the letter was in possession of Plaintiff's counsel, did they admit to having the letter. Defendants requested the letter's return, but

---

**17.** Matos stated at the Nov. 2004 hearing that "[w]hen I received the file from the New Jersey Division [of Civil Rights] and that letter was in there, I had—even if I thought it was privileged, I could not refuse to disclose that letter, it was now part of the file." Nov. Tr. at 16. What Matos actually meant is that she was allegedly foreclosed from turning over the letter, even if it was privileged, because it was in the NJDCR file. This reasoning is without merit.

Hodulik refused. Instead, Hodulik requested that the Court undertake an *in camera* review. Defendants correctly point out that had they not discovered that Plaintiff's counsel was in possession of the letter, it is likely that Defendants would have never been notified. Consequently, this factor weighs heavily in favor of disqualification.

### (iii) The extent to which the attorney reviews and digests the information

The third factor, concerning the extent to which the attorney reviews and digests the privileged information, also points towards disqualification. Maldonado argues that because the letter did not identify witnesses by name it gave his counsel no advantage. The significance of the letter will be addressed in the next factor; however, the assertion that Maldonado's counsel placed no reliance on the letter is unsupported because the October 7th letter was referenced in "Paragraph 93" in both the initial Complaint and Amended Complaint. Presumably, if the letter had no significance it would not have garnered so much emphasis in Maldonado's pleadings. The appropriate conclusion is that counsel fully digested the contents of the letter to Maldonado's advantage.

### (iv) The significance of the privileged information

Fourth, the significance of the privileged information has to be considered. In doing so, it must be determined to what extent did the letter's disclosure prejudice the Defendants' defenses, as well as to what extent a return of the documents will mitigate that prejudice. The letter contained confidential information detailing what Defendants Mason and Costello believed were inaccuracies in the NJDCR finding of probable cause. Further, Defendants set forth reasons why they believed Maldonado filed his Verified Complaint in the first place. Also, the letter contained statements by Costello and Mason, that challenged the credibility of various witnesses who gave statements on Maldonado's behalf during the NJDCR investigation.

The letter was meant to be used in conjunction with the NJDCR finding of probable cause in order for their attorney, DAG Griffin, to prepare their defense, either in the NJDCR proceeding, or in a future civil action. At the November 16, 2004 hearing, DAG Gonzales stated that:

> Mr. Maldonado and counsel are in possession of their [sic][our] trial strategy. The facts and the Defendants at the DCR level are essentially the exact same parties and facts that we have before the Court now. The witnesses would very, very possibly be the same witnesses. Mr. Maldonado used these witnesses to obtain a finding of probable cause. It's certainly logical that he would again use these witnesses here before the Court in this matter. So, we have the same parties, we have the same facts, we have the same witnesses and, again, this goes to Defendants' trial strategy.

Nov. Tr. at 7–8. DAG Gonzales summarized the effect of the disclosure by stating:

> I feel that the Defendants cannot be on a fair playing field, that they are prejudiced by the fact that both this Plaintiff and his attorney are privy to what would be our trial strategy, these witnesses' statements for the basis of the DCR finding which said that there was probable cause that Mr. Maldonado was discriminated against.

*Id.* at 13. Essentially, the letter was a blue print to merits of Plaintiff's case, as well as Defendants' defenses; therefore, its significance cannot be overstated. It is concluded that the letter's disclosure resulted in substantial prejudice to Defendants. The bell cannot be unrung here; hence, return of the documents will not mitigate the prejudice. This factor strongly supports disqualification.

### (v) The extent to which Defendants are at fault for the disclosure

The fifth factor considers the extent to which Defendants may be at fault for the unauthorized disclosure.[18] It was determined in Part II.B, *supra*, that no evidence was presented that Maldonado engaged in any misconduct concerning the misappropriation of the letter. Likewise, it cannot be

---

**18.** Defendants handling of the letter was extensively discussed in Part II.A, *supra,* and it was

determined that Defendants used reasonable precautions to safeguard the letter.

determined that Defendants were in anyway careless in their handling of the letter. This is not a case of inadvertent disclosure during the normal discovery process that could potentially constitute a waiver of privilege. Defendants did not provide any of the contested documents to Maldonado or his attorneys. There is no finding of actual fault, nor can fault be imputed on Defendants. Therefore, this factor weighs in favor of disqualification.

### (vi) The extent to which the nonmovant will suffer prejudice as a result of the disqualification

The final factor measures the prejudice to Maldonado. Defendants argue that the prejudice is minimal because the discovery process has just begun. It is also likely that the duration and complexity of the discovery will be lessened by the fact that the majority of the discovery has already occurred as a consequence of the NJDCR investigation. Maldonado did not advocate any position on this issue; yet, there is nothing to suggest that new counsel could not be found to represent Maldonado. Although Title VII and LAD claims present complex issues, the Court preemptively rejects the contention that Matos or Hodulik are the only attorneys that could or would handle the case. Unquestionably, Maldonado will be deprived of the counsel of his choice. However, when chosen counsel strains the limits of ethical conduct, that choice has to yield to the preservation of a fair and just litigation process. The Court questioned Matos about this issue at the November 16, 2004 hearing:

> Wouldn't the prejudice to the Defendant be greater than the prejudice to a Plaintiff to obtain new counsel who will not have that advantage having this letter disclosed to him? A couple of weeks to obtain new counsel, a month to obtain new counsel, as opposed to the prejudice that the Defendant[s] would argue falls upon them because this information is now in the hands of counsel?

(Nov. Tr. at 26.)

In sum, the record before the Court shows the following: 1) Maldonado's present counsel had access to privileged material since at least October 3, 2003; 2) counsel reviewed and relied on the October 7th letter in formulating Maldonado's case; 3) the letter was highly relevant and prejudicial to Defendants' case; 4) counsel did not adequately notify opposing counsel of their possession of the material; 5) Defendants took reasonable precautions to protect the letter and cannot be found at fault for the disclosure; and 6) Maldonado would not be severely prejudiced by the loss of his counsel of choice.

Although Plaintiff's counsel has gone to great lengths and argued stridently that no confidences were revealed or used, the undisputed facts demonstrate that counsels' possession of the October 7th letter creates a substantial taint on any future proceedings. Simply returning the letter and removing the possibility of any future impingement on Defendants' attorney-client privilege will not remove the taint. It was aptly stated by one district court, "A reasonable member of the bar or the public would share ... the nagging suspicion that [the opposition's] trial preparation and presentation of their case had benefitted from confidential information obtained from [the letter]." *Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037, 1045 (W.D.Mo.1984). Indeed,

> [t]he dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case.

*Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2nd Cir.1973).

Both Matos and Hodulik did not adhere to the "cease, notify, and return" mandate of the New Jersey Supreme Court's Advisory Committee on Professional Ethics and the New Jersey Rules of Professional Conduct. The Court's decision, however, rests more appropriately on the prejudicial effect that the disclosure of the October 7th letter has on Defendants' case. This sanction is drastic; yet, in disqualification situations any doubt is to be resolved in favor of disqualification. Therefore, the Court finds that the appropriate remedy to mitigate the prejudicial effects of counsels' possession, re-

view, and use of the letter is the disqualification of Matos and Hodulik.

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Protective Order is granted. Additionally, Defendants' Motion to Dismiss Plaintiff's Complaint with Prejudice is denied, and Defendants' Motion to Disqualify Plaintiff's Counsel is granted.

An appropriate Order will be entered.