Present:  Hassell, C.J., Keenan, Koontz, Kinser, and Lemons,
JJ., and Russell and Lacy[1], S.JJ.

BETTE L. BANKS

v.  Record No. 061348

MARIO INDUSTRIES OF VIRGINIA, INC.

                              OPINION BY JUSTICE DONALD W. LEMONS
                                      September 14, 2007
TROY COOK, ET AL.

v.  Record No. 061355

MARIO INDUSTRIES OF VIRGINIA, INC.

           FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                       Charles N. Dorsey, Judge

     In these consolidated appeals from civil actions in which

a company alleged that certain former employees and agents

formed a competing business, we consider whether the trial

court erred by denying a motion to strike, submitting a breach

of fiduciary duty claim to the jury, submitting a verdict form

to the jury, instructing the jury, admitting a pre-resignation

memorandum into evidence, and failing to set aside a punitive

damages award.

                          I. FACTS AND PROCEEDINGS

                             A. The Parties

     These consolidated appeals involve claims by Mario

Industries of Virginia, Inc. ("Mario"), a lighting

_____

     [1] Justice Lacy participated in the hearing and decision of
this case prior to the effective date of her retirement on
August 16, 2007.

manufacturer and supply company, against its former employee, Troy Cook ("Cook"); Cook's new company, Renaissance Contract Lighting & Furnishings, Inc. ("Renaissance"); the other principal in Renaissance, Joseph Cassell ("Cassell"); and two of Mario's former sales representatives, The Darnell Group ("Darnell") and Bette L. Banks ("Banks").

## B. Facts

The facts will be stated in the light most favorable to Mario, the prevailing party at trial. Bitar v. Rahman, 272 Va. 130, 141; 630 S.E.2d 319, 325-26 (2006).

## 1. Background

Mario, a company that started more than eighty years ago, manufactures and sells lighting products. Louis Scutellaro ("Scutellaro"), who purchased Mario from his uncle in 1988, is Mario's president, and Delores Scutellaro, his wife, is its secretary.

Mario maintains two separate divisions, namely a residential retail sales division and a contract lighting division ("contract lighting" or "contract sales"). This case involves the contract lighting division which sells lighting, lamps and other lighting products to hotels, nursing homes, and government entities.

Mario did not require its employees to sign non-compete or confidentiality agreements. However, Mario's employee

2

handbook explained that outside employment must not conflict with Mario's interests and that employees had an obligation to prevent actual or potential conflicts of interest. Mario's employee handbook also specifically addressed the protection of confidential information. Mario's employee handbook prohibited: the unauthorized removal of files from the computer and information systems, removing or copying Mario's documents, removing company property, and personal use of Mario's computer and information systems that was detrimental to Mario.

Additionally, Mario restricted access to its sales figures. Deidre Frank ("Frank"), the controller at Mario, testified that Cook knew sales information was confidential. Mario also took steps to protect its customer list that it spent eighty years developing and, as Scutellaro testified, was "worth millions" to Mario. Mario also treated as confidential its computer assisted drawings, costing sheets, target price points, selling prices, and key suppliers. Mario "copyrights [some of its] items," and its catalogs are protected by copyright.

## 2. Independent Sales Representatives

Mario uses independent sales representatives in its contract sales division to promote and sell Mario's products. Each of Mario's sales representatives has an exclusive

territory. Scutellaro explained that "[i]n exchange [for an exclusive territory], [Mario] expect[s] their loyalty. That's the way it's done in this industry." In other words, in exchange for an exclusive territory, Mario did not permit its sales representatives to represent a competing company.

Mario's sales representatives are not Mario employees. Mario does not provide its sales representatives with a salary, health insurance, or pension benefits. Instead, the sales representatives are only paid commissions. Mario's commission rate is generally 8%, but that rate may fluctuate. Mario withholds no taxes on commissions paid and issues IRS 1099 forms to its sales representatives rather than W-2 forms. Mario pays for the catalogs, swatches, and samples it gives to its sales representatives. Mario also pays most of the sales representatives' expenses for attendance at Mario business meetings.

Cook began working at Mario in 1990. Cook, an at-will employee, served as the manager for Mario's contract sales division from 1995 to November 7, 2003.

Banks was Mario's sales representative in Virginia, Maryland, and D.C. from January 26, 1998 until her resignation on June 1, 2004. Banks testified that she "was a contract agent, an independent sales representative" and "was not an employee of Mario."

4

Darnell Group is a sales organization formed by Joseph Darnell in 1992. Darnell was Mario's sales representative for Illinois and Michigan from 1988 through the date of its resignation on January 29, 2004.

### 3. Cook Forms Renaissance and Leaves Mario

In March 2003, Cook considered leaving Mario to establish his own business. Cook prepared a memorandum ("Renaissance's business plan") outlining some of his ideas and ambitions. Cook intended for his business, Renaissance, a lighting and furniture manufacturer, to compete with Mario's contract sales division. Cook also contacted Cassell, who had previously been the warehouse manager for Passport, a Mario company, about forming Renaissance. At that time, Cassell was working on his own plans to start a metal furniture manufacturing business. Cassell was unfamiliar with contract lighting, so Cook shared Renaissance's business plan with Cassell.

Renaissance's business plan contained confidential information about Mario's growth rate, yearly sales totals, past projects, target price points for customers, profit margin, vendor lists, key accounts and suppliers, marketing plans and strategies, production costs, commissions, trade secrets, and intellectual property. Cassell and Cook admitted that it was improper for Cook to reveal Mario's confidential information. Cassell also admitted that he would not want his

5

competitor to have this information.  Cassell admitted that the information about Mario's business helped Renaissance become "highly competitive."

By April 2003, Cook and Cassell had selected Renaissance's name, chosen a facility, and created company letterhead.  Renaissance was incorporated in October 2003.  From March to November 2003, Cook and Cassell were Renaissance's two employees.  Cassell was the president of Renaissance, and Cook was the vice president.

Cook worked for Renaissance while employed by Mario and did so during normal working hours at Mario.  Cook and Cassell planned to take fifteen of Mario's sales representatives to Renaissance.  While employed at Mario, Cook spoke to at least three sales representatives about Renaissance, including Darnell.

Prior to his resignation, Cook sought legal advice with regard to his resignation.  He prepared a memorandum for his attorney on a computer owned by Mario summarizing issues regarding Mario, the contract lighting industry, Cook's planned resignation, and Renaissance ("pre-resignation memorandum").  In the pre-resignation memorandum, Cook stated: "I feel sure I will be presented with opportunities for previously negotiated projects."

When Cook resigned in November 2003, Cook gave Scutellaro a letter indicating that he left company information in a box in his office. However, Scutellaro did not find the box. Cook's business cell phone was returned to Mario, but the cell number was not. Cook also deleted emails, quotes, files, and electronic spreadsheet forms from his computer. Mario's forensic computer expert testified that he found documents related to the formation of Renaissance on the hard disk drive of the computer Cook had used at Mario. The forensic expert also recovered the pre-resignation memorandum. The computer's hard drive also contained an electronic spreadsheet showing all of the open projects associated with the Hilton Garden Inns, a chain of hotels owned by a hotelier who was, at the time, one of Mario's most significant customers. All of these documents had been printed from Mario's computer.

Cassell admitted that it was wrong for a sales representative to take a contract from one manufacturer to another. Nevertheless, after he resigned, Cook testified that he "encouraged" Mario's sales representatives to send business to Renaissance. Cook also used Mario's business phone book, which contained valuable and confidential contact information for Mario's customers, vendors, and sales representatives, to help him at Renaissance. Cook and Cassell used Mario's confidential information to obtain financing for Renaissance.

7

Also, Renaissance took Mario's vendor and customer list and Mario's pricing and sales figures "to use to their advantage."

### 4. Banks and Darnell Help Renaissance While Still at Mario

Banks testified that Cook and Cassell did not ask or encourage her to divert projects from Mario to Renaissance. Nevertheless, after Cook resigned from Mario, Banks "pretended" to be Mario's sales representative. Banks thought Mario trusted her. Banks, however, admitted that she "had no loyalty to Mario at all," and her only "boss" is her "checkbook." Banks admitted that confidential quotes should normally not be sent to competitors because the information is "commercially sensitive" to Mario. Banks also knew that Mario expected her to act as its representative, and "if [she] did a deal with a customer for which [Mario] gave a quote, [Mario] would be the manufacturer." Banks knew that Mario would not let her represent both Mario and Renaissance. Banks, however, admitted that, while representing Mario, she sent quotes to Renaissance instead of sending them to Mario. Even Cook conceded that Banks was disloyal to Mario and acted in her own best interest. Banks would send a confidential Mario quote to a competitor if "it was to [her] advantage" and "[i]f it means putting a dollar in my checkbook."

Banks diverted the following projects from Mario to Renaissance: Residence Inn Capitol, Fisherman's Wharf,

8

Sheraton Key Largo, Big Sur Lodge, and Annapolis Marriott. Banks explained that she did this because she felt that "[i]t would have either cost Mario money or Bette Banks money. I think that Mario has a whole lot more money than I do." On June 1, 2004, Banks resigned from Mario and joined Renaissance because Renaissance offered her a 10% commission.

Similar to Banks, Darnell diverted the Hyatt Deerfield project from Mario to Renaissance. When Scutellaro confronted Darnell with this information, he resigned and joined Renaissance.

### C. Causes of Action

Mario sued Banks for damages and in a separate action, Mario sued Cook, Cassell, Renaissance, and Darnell. The two suits against Banks and Cook and his co-defendants (collectively "the defendants") were consolidated into a single action. Mario's case proceeded on the following theories: (1) tortious interference with business relations (against all the defendants); (2) common law conspiracy (against all the defendants); (3) statutory conspiracy (against all the defendants); (4) breach of fiduciary duty (against Cook, Banks, and Darnell); (5) misappropriation of trade secrets (against Cook, Cassell, and Renaissance); and (6) conversion (against Cook, Cassell, and Renaissance).

D. Pre-Trial Objection

Prior to trial, Cook objected, on grounds of attorney-client privilege, to Mario introducing Cook's pre-resignation memorandum into evidence. The trial court overruled the objection.

E. Alleged Damages & 40% Gross Profit Margin

At trial, Scutellaro qualified, without objection, as an expert in "lighting manufacturing and quoting of lighting products." Scutellaro testified about Mario's lost revenues and lost profits, allegedly resulting from the defendants' actions that caused Mario to lose specific contract lighting projects. Evidence offered by Mario regarding lost revenues and lost profits (applying a 40.5434% gross profit margin) was as follows:

| PROJECT | LOST REVENUES | LOST PROFITS |
|---|---|---|
| Hilton Garden Inn | $2,000,000 | $810,868 |
| Benjamin West | $3,532,400 | $1,419,019 |
| Fisherman's Wharf | $48,950 | $19,845.99 |
| Big Sur Lodge | $25,793.08 | $10,457.39 |
| Annapolis Marriott | $37,806.50 | $15,328.04 |
| Residence Inn Capitol | $12,420 | $5,035.49 |
| Sheraton Key Largo | $32,615.12 | $13,223.28 |
| Hyatt Deerfield | $96,480.62 | $39,116.52 |
| Other Contract Sales | $876,740 | $400,000 |
| File Recovery & Reconstruction | N/A | $25,625.90 |
| TOTAL | $6,663,205.32 | $2,758,519.61 |

Mario's lost profits figures were necessarily dependent upon Scutellaro applying Mario's 40.5434% gross profit margin to its lost revenues.  When asked what Mario's lost profits were with respect to the Benjamin West project, Scutellaro testified that Mario's gross profit margin is 40.5434% and that it "is calculated by [Mario's] accountant."  The defendants then objected "[a]s to entering figures reportedly given [to Scutellaro] by his accountant."  Mario's counsel indicated that the accountant was present.  The trial court sustained the objection on hearsay grounds.  The question was posed again.  Notably, the parties did not condition Scutellaro's response regarding the 40% gross profit margin on Mario's accountant testifying.  Upon posing the question again, Scutellaro testified, without objection, that Mario's gross profit margin was 40.5434%.

Mario never called its accountant to testify.  Instead, Scutellaro testified about the gross profit margin using an exhibit demonstrating Mario's gross profit margin.  The defendants again objected to Scutellaro testifying to Mario's 40% gross profit margin, arguing that Scutellaro was not qualified as an expert in accounting.  The trial court overruled the objection, saying "I don't think he is testifying as to anything that would require any expertise so far."

11

Finally, the defendants objected, arguing that Mario did not lay a proper foundation to Scutellaro applying the 40% gross profit margin to Mario's lost revenues for each of the projects. The trial court overruled the objection on the grounds that "the foundation is his knowledge as an owner of the business."

## F. Motion to Strike

At the conclusion of Mario's case in chief and again at the conclusion of all of the evidence, the defendants moved to strike Mario's evidence. First, the defendants argued that all damage claims based on the 40% gross profit margin should be struck. The defendants argued that the Mario's "basic underlying measure of gross profits . . . is so flawed as to render the calculations speculative." The defendants further argued that the 40% gross profit margin "is derived by calculations that incorporate extraneous factors and look in the wrong direction." Specifically, the defendants claimed that "any damages that are derived using the 40 percent figure should be struck because the 40 percent figure is so inaccurate that it results in speculation or distortion."

Second, the defendants argued that the damages evidence related to certain, specific lost projects should be struck either because there was no evidence of what the winning bid was for the project, there was no evidence that a purchase

12

order had been issued, the purchasing agent picked a different vendor than Mario, or Mario never submitted a bid for the projects.

Finally, the defendants argued that the breach of fiduciary duty claim should be struck because Darnell and Banks had no fiduciary duty to Mario.  The trial court overruled the motion to strike on each of these bases.

## G. Jury Instructions

The defendants only objected to three of the jury instructions.  First, the defendants objected to jury instructions 15 and 20 because the instructions were "inconsistent with the requirements found in Williams v. Dominion Technology Partners, 265 Va. 280[, 576 S.E.2d 752 (2003)], which requires that the Court determine whether a fiduciary duty exists.  That is an issue of law for the Court, and that the breach of any such duty is an issue for the jury."  Jury instruction number 15 instructed the jury that "[t]he issues raised by Mario Industries['] breach of fiduciary duty claim are as follows: 1) Did a fiduciary relationship exist between the defendant[s] and Mario Industries?  2) If so, did the defendant[s] violate the fiduciary obligation?"  Jury instruction number 20 instructed the jury to determine whether the defendants "breached a fiduciary duty that [they] owed to Mario Industries" and

whether the defendants' "breach of fiduciary duty was a proximate cause of damage[s] to Mario."  The trial court overruled the defendants' objections.

The defendants also objected to jury instruction 16, defining the status and duties of an employee.  The defendants specifically objected to the portion of Instruction 16 that provides that "[e]mployees must exercise the utmost good faith and loyalty toward their employer."  The defendants argued the language "sets a higher standard than is required by law." The trial court overruled the objection.  Other than the jury instructions related to fiduciary duty, the defendants did not object to any other jury instructions, including any of the instructions on common law conspiracy.

## H. Verdict Form

The verdict form was tendered without objection.  The verdict form was divided into sections permitting awards on different theories and against all or some of the defendants. The jury found in favor of Mario and against all of the defendants as to Mario's compensatory damages claims, except for the statutory conspiracy claim, in the amount of $1,528,342.00.  As to punitive damages, the jury found in favor of Mario and against Cook in the amount of $56,700.00. The defendants filed post-trial motions which were heard and denied by the trial court.  The trial court then entered a

final order consistent with the jury's verdict.  The defendants filed timely notices of appeal to this Court.

## II. ANALYSIS

### A. Standard of Review

We review this appeal under well-settled principles.

> When parties come before us with a jury verdict that has been approved by the trial court, they hold the most favored position known to the law.  The trial court's judgment is presumed to be correct, and we will not set it aside unless the judgment is plainly wrong or without evidence to support it.  We view the evidence and all reasonable inferences fairly deducible from it in the light most favorable to the prevailing party at trial.

Xspedius Mgmt. Co. v. Stephan, 269 Va. 421, 424-25, 611 S.E.2d 385, 387 (2005) (quotations and citations omitted).  We review matters of law de novo.  Hubbard v. Dresser, Inc., 271 Va. 117, 122, 624 S.E.2d 1, 4 (2006).

### B. Verdict Form and Damages Instructions

On appeal, Banks argues that the trial court erred "by using a verdict form that lumped all of the defendants together for the compensatory damage claim (other than statutory conspiracy) and in not providing the jury with an opportunity to differentiate between the damages recoverable against the various defendants."  Instead, the verdict form "lumped" Banks with the other defendants for claims for which she was not sued.  Banks also argues that the trial court erred "by failing to instruct the jury on the elements of

15

damages which Mario may be entitled to recover." There was no objection made concerning the verdict form; however, Banks urges the Court to apply the "plain error doctrine" and reverse the trial court because there is "(1) error, (2) that is plain, (3) that is substantial and (4) . . . seriously affects the fairness, integrity and public reputation of the judicial system."  Of course, we consider such challenges under the "ends of justice" exception found in Rule 5:25.

As previously mentioned, Banks did not object to the verdict form.  Additionally, the trial court was not required to instruct the jury, sua sponte, on the elements of damages Mario was entitled to recover in the absence of a request from Banks to do so.  Because Banks raises these arguments for the first time on appeal and we find no reason to invoke the ends of justice exception, the arguments are waived.  Rule 5:25.

## C. Breach of Fiduciary Duty

On appeal, Banks challenges the trial court's decisions on Mario's breach of fiduciary duty claim with the following assignments of error:

1. The trial court committed reversible error when it refused to determine as a matter of law whether Ms. Banks owed a fiduciary duty to Mario and instead submitted to the jury the issue of whether a fiduciary relationship existed between Ms. Banks and Mario.

2. The trial court committed reversible error when it failed to strike Mario's evidence regarding the breach of fiduciary duty claim filed against Ms. Banks.

16

Cook also challenges the trial court's decisions on Mario's breach of fiduciary duty claim:

1. The trial court committed reversible error when, despite timely objection, it failed to follow the rule established in Williams v. Dominion Technology Partners, L.L.C., 265 Va. 280, 289, 576 S.E.2d 752, 758 (2003), gave instructions Nos. 15, 16, and 20 over objection, failed to determine as a matter of law whether defendants Darnell Group and Cook owed a fiduciary duty of loyalty to the plaintiff, failed to rule as a matter of law on the extent of any such duty, and instead submitted the existence of the duty to the jury.

2. The trial court committed reversible error in overruling the defendants' motions to strike, in giving over objection instructions Nos. 15, 16, and 20 submitting the existence and breach of a fiduciary duty to the jury, and in overruling the defendants' post-trial motion to set aside, where the evidence showed as a matter of law that Darnell Group owed no fiduciary duty to the plaintiff and where the trial court failed to define and instruct on the limited and changing duties Cook owed Mario under the circumstances of this case.

The trial court did not err in submitting the breach of fiduciary duty claim to the jury. Instruction 17, given without objection, stated:

> Agency is a fiduciary relationship between two parties in which one party agrees to act on behalf of and subject to the control of the other party. In an agency agreement, the parties agree that the agent shall act on behalf of and subject to the control of the principal. If a party is not an agent, that party is not a fiduciary.

In other words, instruction number 17 informed the jury that if agency was found, then the agent owed a fiduciary duty to the principal. This instruction became the law of the case. Ulloa v. QSP, Inc., 271 Va. 72, 80, 624 S.E.2d 43, 48 (2006).

17

Cook was an employee of Mario and admitted he owed Mario a duty of loyalty. Banks admitted that she was Mario's agent and that she owed a duty of loyalty to Mario. These party admissions combined with the fact that Banks' job was to faithfully represent Mario's interests in her territory, support the claim of a fiduciary duty. Finally, while Darnell did not admit that it was Mario's agent, it was a sales representative for Mario, under the same circumstances as Banks. Pursuant to the instructions given, the jury could have reasonably found that Darnell was Mario's agent. Pursuant to instruction 17, once an agency relationship was established, Cook, Banks, and Darnell necessarily owed a fiduciary duty to Mario.

## D. Pre-resignation Memorandum

Cook next argues that the trial court erred in allowing Mario "to introduce into evidence, over objection, the confidential pre-resignation memorandum Cook prepared for the purpose of seeking legal advice from his lawyer." Specifically, Cook argues that "[t]he trial court violated Virginia's longstanding recognition of the sanctity of attorney-client communications when it allowed Mario to introduce, over objection, and to emphasize repeatedly a confidential memorandum that Cook prepared exclusively for the

purpose of seeking legal advice from his attorney."  Cook's argument is without merit.

"Confidential communications between attorney and client made because of that relationship and concerning the subject matter of the attorney's employment are privileged from disclosure, even for the purpose of administering justice." Commonwealth v. Edwards, 235 Va. 499, 508-09, 370 S.E.2d 296, 301 (1988) (quotation omitted).  This privilege, however, is not absolute and may be waived.  See Virginia Elec. & Power Co. v. Westmoreland-LG&E Partners, 259 Va. 319, 326, 526 S.E.2d 750, 755 (2000).

Pursuant to Mario's employee handbook, Mario permitted employees to use their work computers for personal business. However, Mario's employee handbook provided that there was no expectation of privacy regarding Mario's computers.  Cook created the pre-resignation memorandum on a work computer located at Mario's office.  Cook printed the document from this computer, and Cook sent it to his attorney for the purposes of seeking legal advice.  Cook then deleted the document from the computer.  Mario's forensic computer expert, however, retrieved the document from the computer's hard drive.  We held in Clagett v. Commonwealth, 252 Va. 79, 92, 472 S.E.2d 263, 270 (1996), that "the [attorney-client] privilege is waived where the communication takes place under

19

circumstances such that persons outside the privilege can overhear what is said."  See Edwards, 235 Va. at 509, 370 S.E.2d at 301 ("The privilege may be expressly waived by the client, or a waiver may be implied from the client's conduct.").  Therefore, we hold that the trial court did not err in admitting the pre-resignation memorandum into evidence.

## E. Damages

On appeal, Cook, Cassell, Renaissance, and Darnell challenge the damages award, asserting that:

> The trial court committed reversible error in overruling the defendants' motions to strike and post-trial motion to set aside regarding the plaintiff's proof of damages where, as a matter of law, the plaintiff's damages evidence was speculative, contingent, uncertain, failed to show the claimed damages with any reasonable certainty, failed to show that the defendants' acts or omissions were the direct and proximate cause of the claimed damages, and rested on the testimony of an unqualified expert.

Banks also challenges the damages award, asserting that "[t]he trial court committed reversible error when it failed to sustain the motion to strike Mario's evidence because its proof of damages was speculative, counterfactual, unsupported by the evidence, and failed to prove proximate cause."

We review the trial court's ruling denying the motion to strike in accordance with well-settled principles:

> When the sufficiency of a plaintiff's evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to

20

the sufficiency of the evidence in plaintiff's favor and should grant the motion only when it is conclusively apparent that plaintiff has proven no cause of action against defendant, or when it plainly appears that the trial court would be compelled to set aside any verdict found for the plaintiff as being without evidence to support it.

Saks Fifth Ave., Inc. v. James, Ltd., 272 Va. 177, 188, 630 S.E.2d 304, 311 (2006) (quotations omitted).

In order to recover damages for lost profits from the defendants, Mario

had the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery. When an established business, such as [Mario], is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business by reason of the wrongful act, measured by the loss of the usual profits from the business.

Id. (quotations and citations omitted). Therefore,

where the loss of prospective profits is the direct and proximate result of the breach . . . and they can also be proved with a reasonable degree of certainty, such loss is recoverable, but it is equally well settled that prospective profits are not recoverable in any case if it is uncertain that there would have been any profits, or the alleged profits are so contingent, conjectural, or speculative that the amount thereof cannot be proved with a reasonable degree of certainty.

Id. at 188-89, 630 S.E.2d at 311 (quotations omitted).

Accordingly, first Mario "must show a causal connection between the defendant[s'] wrongful conduct and the damages

21

asserted.  Second, [Mario] must prove the amount of those damages by using a proper method and factual foundation for calculating damages."  Id. at 189, 630 S.E.2d at 311.

The admissibility of evidence and the sufficiency of evidence are distinct issues.  It follows that objections to the admissibility of evidence and the sufficiency of evidence are also distinguishable.

" '[A]n objection to the admissibility of evidence must be made when the evidence is presented.  The objection comes too late if the objecting party remains silent during its presentation and brings the matter to the court's attention by a motion to strike made after the opposing party has rested.' "  Bitar v. Rahman, 272 Va. 130, 139, 630 S.E.2d 319, 324 (2006) (quoting Kondaurov v. Kerdasha, 271 Va. 646, 655, 629 S.E.2d 181, 185 (2006)).  However, "[i]n some circumstances, a defect in an expert witness' testimony may not be apparent until the testimony of that witness is completed."  Id. at 140, 630 S.E.2d at 324-25.  Therefore, an objection to the admissibility of the evidence "raised at that first opportunity is timely."  Id.; see also Vasquez v. Mabini, 269 Va. 155, 163, 606 S.E.2d 809, 813 (2005).  In contrast,

> an objection to the sufficiency of the evidence
> is properly made by a motion to strike, rather
> than when the evidence is first offered.
> Obviously, the objecting party cannot be sure,

> nor can the court decide, until the offering
> party has rested, whether the various fragments
> of evidence have added up to a justiciable
> whole.

Kondaurov, 271 Va. at 655, 629 S.E.2d at 185-86 (citation

omitted).

In this case, nothing prohibited the defendants from

moving to strike Mario's evidence at the conclusion of its

case in chief or at the conclusion of all of the evidence.

However, such a motion testing sufficiency of the evidence

must be weighed by the evidence that has been admitted.  Here

Scutellaro qualified as an expert witness in the lighting

industry.  After a preliminary challenge based upon hearsay,

the evidence of a 40% gross profit margin was elicited without

objection.  The trial court observed that Scutellaro was

testifying from knowledge "as an owner."  Pursuant to our

prior holdings in Bitar, Kondaurov, Vasquez, and Countryside

Corp. v. Taylor, 263 Va. 549, 552 & n.2, 561 S.E.2d 680, 682 &

n.2 (2002), such evidence was admitted without objection and

the question of admissibility of this evidence is not the

proper subject of a motion to strike which tests sufficiency.[2]

---

[2] There may be circumstances where evidence is admitted conditioned upon further foundational support and the satisfaction of that condition may not be known until the conclusion of the case-in-chief or at the end of presentation of all of the evidence.  The proper motion at that time is a motion to exclude the evidence.  Assuming that exclusion of the evidence creates deficiencies in the quantum of proof, a

## 1. Hilton Garden Inn

The following evidence regarding Mario's damages from losing the Hilton Garden Inn project was admitted without objection. In 1999, Mario entered "a contract or program" with Hilton "making their lighting exclusively for [Hilton Garden Inn's] guest rooms." During the course of this exclusive contract or program, in April 2003, Cook received a request for pricing from Hilton on a Hilton Garden Inn project. In May 2003, Cook submitted a bid for the Hilton Garden Inn project without properly working out the pricing. Scutellaro testified that "there were no calculations done. This was just really a guess . . . I have to assume it was an educated guess." Scutellaro testified that "[b]ecause of [Cook's] improper quote [Mario] lost the job, [Mario] lost the business." Scutellaro further testified that his calculation for the project was 10% lower than Cook's calculation for the job. This difference "means the difference between getting a job and losing a job." As a result of losing this project, Mario is "no longer the exclusive vendor for lighting for Hilton Garden Inn." Additionally, Scutellaro testified that Mario had "a reasonable expectation of getting all of these projects."

---

motion to strike may then test the sufficiency of the evidence.

As a result of losing the Hilton Garden Inn project, Mario claimed $2,000,000 in lost revenue and $810,868 in lost profits.  Scutellaro testified that he knew who was awarded the project; however, he had no evidence of the amount of the winning bid.  This evidence was admitted without objection. Having been admitted, the evidence was sufficient to support a jury finding that Mario would have won the Hilton Garden Inn project based on Mario's long-term relationship with Hilton and Mario's contract or program as "the exclusive guest room lighting manufacturer" for Hilton Garden Inn.

## 2. Benjamin West

The following evidence regarding Mario's damages from losing the Benjamin West project was also admitted without objection.  Mario had a prior working relationship with Benjamin West.  Benjamin West solicited bids from Mario and two other companies to supply lighting products to unspecified buyers.  Cook submitted Mario's bid on his last day of work. Scutellaro learned of Cook's bid after Cook resigned when Benjamin West contacted Mario to inquire about samples.  When Scutellaro reviewed the project's file, Scutellaro learned that Cook attended a meeting in September 2003 with the president of Benjamin West and two other lighting manufacturers.  Scutellaro testified that he reviewed Cook's notes from the meeting with Benjamin West and testified that

"this [wa]s not a speculation project, this [wa]s [a] reality."  Scutellaro asserted that Cook "ball parked" the pricing for the project, failing to do the work necessary to get an accurate quote.  Scutellaro testified that Cook "did nothing to quote this three and a-half million dollar project, potentially a $30 million project."  Scutellaro also testified that Cook submitted a bid to Benjamin West that was a million dollars too high.  Scutellaro stated that "because of [Cook's] bogus bid, [Benjamin West] had eliminated us from the project."

As a result of losing the Benjamin West project, Mario claimed $3,532,400 in lost revenue and $1,419,019 in lost profits.  Scutellaro testified that Ashley Lighting won the project.  The evidence was admitted without objection.  Having been admitted, the evidence was sufficient to support a jury verdict finding that Mario would have won the Benjamin West project based on Mario's long-term relationship with Benjamin West.

The combined lost profits from the Hilton Garden Inn project, $810,868, and the Benjamin West project, $1,419,019, were $2,229,887, exceeding the compensatory damages award.  We hold that the evidence was sufficient to support the jury's conclusion that the defendants' wrongful conduct caused Mario's damages and that there was sufficient evidence from

26

both the Hilton Garden Inn project and the Benjamin West project to support the compensatory damages award. Accordingly, we need not consider the remaining projects from which Mario alleges damages. Bitar, 272 Va. at 141, 630 S.E.2d at 325-26 ("[W]here the trial court has declined to strike the plaintiff's evidence or to set aside a jury verdict, the standard of appellate review in Virginia requires this Court to consider whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the plaintiff.").

Additionally, the evidence was sufficient to support the compensatory damages verdict against all the defendants. As previously noted, some theories of recovery were not asserted against all the defendants. However, on the claim of common law conspiracy, each of the defendants was alleged to have conspired with the others to injure Mario in its legitimate business expectations. The jury instructions on the subject, given without objection, were:

Jury Instruction No. 7

The issues with regard to Mario Industries common law conspiracy claim are as follows:
1). Did two or more defendants combine to accomplish, by some concerted action, a criminal or unlawful purpose; or
2). Did two or more defendants combine to accomplish, by some concerted action, a lawful purpose by criminal or unlawful means.

27

On either of these issues, the plaintiff has the burden of proof by the greater weight of the evidence.

Jury Instruction No. 8

A common law conspiracy consists of two or more persons combining to accomplish, by some concerted action, some criminal or unlawful purpose or some unlawful purpose by criminal or unlawful means.

Jury Instruction No. 9

No cause of action for common law conspiracy may exist without resulting injury and the damage produced must arise as the effective result of the conspiracy.

Jury Instruction No. 10

You shall find for Mario Industries on its claim of common law conspiracy and against the defendants, or two or more of them, if it proves by a preponderance of evidence either that:

1). Two or more defendants combined to accomplish, by some concerted action, a criminal or unlawful purpose which resulted in damage to the plaintiff; and

2). Two or more defendants combined to accomplish, by some concerted action, some lawful purpose by either criminal or unlawful means which resulted in damage to plaintiff.

You shall find for the defendants, or any of them, if the plaintiff fails to prove either of these elements.

Jury Instruction No. 14

When two or more persons join in a conspiracy, then each one is liable for any tortious acts of the other that is committed within the scope of the conspiracy.

28

Upon review of the evidence presented, we conclude that it was sufficient to support the compensatory damages verdict for common law conspiracy against all the defendants.

## F. Punitive Damages

Finally, Cook argues that the trial court erred in not setting aside "the punitive damages verdict against Cook, because no awardable compensatory damages were proved, and because as a matter of law Cook did not act with the required level of misconduct and did undertake reasonable efforts to ensure that his resignation and subsequent conduct were lawful." Phrased differently, Cook argues that punitive damages should not have been awarded because "the evidence, as a matter of law, fails to prove malice, willfulness, or wantonness by Cook." Therefore, the evidence does not support a punitive damages award. Cook's argument is without merit.

The purpose of punitive damages "is not so much to compensate the plaintiff but to punish the wrongdoer and to warn others," and such damages "may be recovered only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others." Hamilton Dev. Co. v. Broad Rock Club, 248 Va. 40, 45, 445 S.E.2d 140, 143 (1994) (quotation omitted). Jury instruction 47, given without objection, defined "actual malice" as "a sinister or corrupt motive such as hatred,

29

personal spite, ill will, or a desire to injure the plaintiff."

In this case, Cook formed Renaissance while he was employed at Mario, and Cook admitted that he intended for Renaissance to compete with Mario.  Based upon this evidence, the jury could have concluded and did conclude that Cook had the requisite malice to injure Mario.  We hold that the trial court did not err in refusing to set aside the award of punitive damages against Cook.

### III. CONCLUSION

For the reasons stated, we will affirm the judgment of the trial court.

<u>Affirmed</u>.