PRESENT: Koontz, Kinser, Lemons, Goodwyn, Millette, and Mims, JJ., and Russell, S.J.


ANGELA WALTON

OPINION BY
v.    Record No. 091009      JUSTICE LEROY F. MILLETTE, JR.
                             June 10, 2010
MID-ATLANTIC SPINE SPECIALISTS,
P.C., ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
C. Peter Tench, Judge


In this medical malpractice case, we consider whether the defendant doctor waived the attorney-client privilege for a letter he wrote to his attorney regarding potential negligence in his examination of key x-rays when that letter was produced to the plaintiff during discovery. We hold the doctor's disclosure of the letter was inadvertent, but that the doctor waived his attorney-client privilege by failing to take sufficient precautions to prevent the inadvertent disclosure.

### BACKGROUND

Angela Walton suffered a workplace injury to her wrist and began treatment with Jeffrey Moore, M.D., an orthopedic surgeon, and his practice group, Mid-Atlantic Spine Specialists, P.C. (Mid-Atlantic) (collectively, the doctors). Dr. Moore treated Walton's broken wrist from November 1998 to May 1999.

Walton filed a workers' compensation claim and later filed a motion for judgment against the doctors, seeking damages for

medical malpractice associated with the examination, diagnosis, and treatment of her wrist injury.

On November 24, 1998, Dr. Moore took an x-ray of Walton's wrist. Dr. Moore took another x-ray of Walton's wrist on December 1, 1998. After Walton's December 1, 1998 appointment, Dr. Moore noted in her medical record that: "Radiographs were taken in plaster. The thumb looks unremarkable. Do not see any fracture here. The overall alignment looks good."

However, after reviewing the x-rays almost three years later Dr. Moore wrote a letter to his attorney on October 30, 2001 (the letter), in which he explained his thought process in the treatment he provided her. In reference to the December 1st x-ray, Dr. Moore wrote:

> I made a comment that the overall alignment looks "good." I am not convinced I was actually looking at the x-ray from 12/01/98, and may have actually been looking at comparison film of 11/24/98, and mistakenly thought it was the recent follow-up x-ray on that day in the office. I simply cannot remember these events, but I do not consider her overall alignment as looking "good" on 12/01/98.

According to Dr. Moore, he kept his file copy of the letter in a white binder, while medical records were contained in a manila folder.

During discovery in the workers' compensation case, a subpoena duces tecum was issued to Mid-Atlantic. Mid-Atlantic hired Smart Copy Corporation (Smart Copy) to gather the

subpoenaed documents.  Smart Copy obtained a copy of the letter and produced it to the attorney for Walton's employer in the workers' compensation case.  The record does not show how Smart Copy obtained a copy of the letter.

The letter was first produced to Walton's counsel in the medical malpractice case in November 2004.[1]  Walton asserts that she notified the doctors that she was in possession of the letter in her June 2006 answers to interrogatories. Interrogatory 11 requested information about any statements by the doctors which Walton "consider[ed] to be an admission or otherwise probative of liability or negligence."  Walton answered as follows:

> [Dr. Moore] has authored a letter which [Walton] considers to be an admission and/or probative of liability.  The date of the letter is October 30, 2001 and was produced by [Dr. Moore] to the [Workers'] Compensation Commission.  As such, [Walton] is unaware how many people have read the letter, but believe[s] the number is substantial. [Dr. Moore] authored the letter and as such is aware of its contents.

However, the doctors assert they did not learn that Walton was in possession of the letter until they were notified in October 2007 that Walton had the letter and intended to use it at trial.

_____

[1] Walton asserted that counsel representing Walton's employer in the worker's compensation case also sent the letter to the doctors' counsel at that time in response to a subpoena duces tecum.

In November 2007, the doctors filed a motion for a protective order "against the use and/or distribution of [the] letter," alleging that it is protected by the attorney-client privilege, and "contains retrospective critical analysis of the case by [Dr. Moore] and his attorney." The circuit court held several hearings on the doctors' motion. At the first hearing, the circuit court determined that

> disclosure has to be voluntary or there is not a waiver. If it's involuntary disclosure, there is not a waiver. If it's . . . inadvertent or by mistake, if we show this to be inadvertent, then there can be a waiver, then we have . . . Lois Sportswear[, U.S.A., Inc. v. Levi Strauss & Co., 104 F.R.D. 103, 105 (S.D.N.Y. 1985)], those factors.

It was undisputed that Dr. Moore's attorney did not disclose the letter, and neither party argued that criminal behavior or bad faith was involved in the production of the letter. The circuit court took the motion under advisement to give the parties the opportunity to present evidence regarding how Smart Copy obtained the allegedly confidential document.

At the second hearing, the circuit court applied a five-factor test for inadvertent disclosure: (1) the reasonableness of precautions taken, (2) the number of the inadvertent disclosures, (3) the extent of disclosure, (4) the delay and measures taken to rectify the disclosure, and (5) the interests of justice. Based on this analysis, the circuit court made

4

factual findings and held that the privilege had been waived.

The trial judge concluded that

> the only logical inference . . . is that
> Smart [Copy] copied according to their
> procedures and the medical records were
> provided to them and this document had to be
> commingled with them.  I can't believe that
> Smart [Copy] went into a separate place to
> take a binder that was not authorized and
> copied it.

After further argument by counsel, the circuit court again took the motion under advisement to allow the doctors to "bring . . . some evidence to show how the [letter] allegedly got out of Dr. Moore's hands and into the hands of Smart [Copy]."

In February 2009, the doctors filed a motion in limine, asking the circuit court to prohibit Walton's counsel from "asking questions of Dr. Moore regarding any opinions regarding his current interpretation of events that occurred in 1998 and/or 1999."  In its brief in support of the motion in limine, the doctors argued that Dr. Moore had not been designated as an expert witness, and Dr. Moore would only testify regarding his care and treatment of Walton and his contemporaneous interpretation of how Walton was progressing at the time of treatment.

At the third hearing on the doctors' motion for a protective order, counsel for Walton and for the doctors made representations to the circuit court concerning the testimony of

relevant employees of Mid-Atlantic and Dr. Moore's front office staff, and Smart Copy, who were employed in 2004, concerning discovery procedures. However, the circuit court concluded that it was not possible to determine how the letter came to be produced.

The circuit court granted the doctors' motion, ruling that the letter was privileged, had been "involuntarily" disclosed, and there had been no waiver. The circuit court, in its ruling, stated: "And being involuntary by the fact that we don't know how [the letter] was disclosed, but we do know that Dr. Moore has indicated that he didn't give permission and he didn't provide it, and it was not in the records he had, and nobody knows how it got disclosed." The circuit court entered an order "prohibit[ing] [Walton] from any distribution of the privileged correspondence, including but not limited to distributing the letter to [her] experts, and [that] there [would] be no mention of or use of the letter or its content at any trial of this matter."

The circuit court also granted the doctors' motion in limine, and ordered that Walton's counsel was "precluded from asking any questions of Dr. Moore requiring his expert opinions including his retrospective interpretation of events that occurred during his treatment of [Walton] during 1998 and/or 1999."

6

At trial, Dr. Richard Wells testified, as Walton's expert witness, that it would be a breach of the standard of care if Dr. Moore did not look at the December 1, 1998 x-ray.  Dr. Wells also testified that it would be a breach of the standard of care if Dr. Moore mistakenly looked at the November 24, 1998 x-ray thinking it was the December 1st x-ray.  Likewise, Dr. Terrence O'Donovan testified as an expert for Walton that it would be a breach of the standard of care if Dr. Moore failed to look at an x-ray that was taken or if he mistakenly looked at the November 24th x-ray thinking it was the December 1st x-ray.

Dr. Moore testified that he had no recollection of his analysis of the x-rays because he "can't remember them that far back."  Dr. Moore also testified that during his December 1, 1998 examination of Walton, he took another x-ray "to check two things, . . . the fracture as well as the thumb and make sure the thumb looked good on x-ray."  Dr. Moore testified that

> [t]he alignment was good.  All of that was good.  The x-ray of the radius showed . . . some residual dorsal tilt, and that is that slight settling that occurs that we all heard about.  It settles a little bit, natural tendency.  They all do it . . . but there had been no significant change in anything that required me to do anything differently.

Walton's counsel examined Dr. Moore out of the presence of the jury for purposes of a proffer regarding the excluded evidence.  When Dr. Moore was asked, "Doctor, in fact, you may

7

have been mistakenly looking at the November 24, 1998, film when you thought you were looking at the December 1, 1998, film; isn't that true?" Dr. Moore answered, "Anything is possible." Walton's counsel also proffered testimony from Dr. Gregory Degnan that it would have been a breach of the standard of care if, on December 1, 1998, after taking an x-ray, Dr. Moore did not look at the x-ray or if he mistakenly picked up the November 24, 1998 x-ray and thought he was looking at the December 1st x-ray.

The jury rendered a verdict in favor of the doctors and the circuit court entered final judgment on the verdict.

## DISCUSSION

As a general rule, confidential communications between an attorney and his or her client made in the course of that relationship and concerning the subject matter of the attorney's representation are privileged from disclosure. Banks v. Mario Indus., 274 Va. 438, 453, 650 S.E.2d 687, 695 (2007); Commonwealth v. Edwards, 235 Va. 499, 508-09, 370 S.E.2d 296, 301 (1988). The objective of the attorney-client privilege is to encourage clients to communicate with attorneys freely, without fearing disclosure of those communications made in the course of representation, thereby enabling attorneys to provide informed and thorough legal advice. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). "Nevertheless, the privilege

8

is an exception to the general duty to disclose, is an obstacle to investigation of the truth, and should be strictly construed." Edwards, 235 Va. at 509, 370 S.E.2d at 301.

The attorney-client privilege may be expressly or impliedly waived by the client's conduct. Banks, 274 Va. at 453-54, 650 S.E.2d at 695-96; Edwards, 235 Va. at 509, 370 S.E.2d at 301. Courts must consider the specific facts of each case in making a waiver determination, as there is no bright line rule for what constitutes waiver. Grant v. Harris, 116 Va. 642, 648, 82 S.E. 718, 719 (1914). The proponent of the privilege has the burden to establish that the attorney-client relationship existed, that the communication under consideration is privileged, and that the privilege was not waived. Edwards, 235 Va. at 509, 370 S.E.2d at 301; United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982).

In this case, the parties do not dispute the existence of an attorney-client relationship or that the letter was privileged at the time it was written. The issue presented is whether Dr. Moore waived the privilege attached to the letter.[2] Whether inadvertent or involuntary disclosure of a privileged document constitutes a waiver of the attorney-client privilege

---

[2] Walton does not contend that Dr. Moore's attorney waived the attorney-client privilege.

is a mixed question of law and fact subject to de novo review. In re Grand Jury Proceedings, 33 F.3d 342, 353 (4th Cir. 1994).

### A. Walton's Argument

Walton assigns error to the circuit court's ruling that the privilege attached to the letter was not waived. Walton asserts the letter was produced to her during the ordinary course of discovery, the doctors did not produce any evidence that the letter was disclosed as the result of criminal acts or bad faith, and the letter contained an admission by Dr. Moore regarding the most crucial liability issue in the case. Walton contends that the disclosure was not involuntary, but inadvertent, and that the circuit court should have applied a multi-factor analysis using considerations often attributed to Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 104 F.R.D. 103, (S.D.N.Y 1985), which is applied by many jurisdictions in cases of inadvertent disclosure of privileged documents during the ordinary course of discovery.[3]

---

[3] We note that the recently promulgated Federal Rule of Evidence 502(b) adopts general standards concerning whether the party holding the privilege or protection took reasonable steps to prevent disclosure, and promptly took reasonable steps to rectify the error after inadvertent disclosure. The drafters state that they intend to make available for consideration the factors articulated in Lois Sportswear and Hartford Fire Ins. Co. v. Garvey, 109 F.R.D. 323, 332 (N.D. Cal. 1985). Advisory Committee Note of 2008 to Fed. R. Evid. 502.

Walton argues that courts have only applied the involuntary disclosure test when there is evidence that the disclosure resulted from criminal activity or bad faith. Walton maintains that the doctors failed to produce any evidence of criminal activity, bad faith, or any other explanation for the disclosure of the letter besides a unilateral error of "carelessly placing a privileged document in a box of discovery documents and delivering them to the other side." Maldonado v. New Jersey, 225 F.R.D. 120, 129 (D. N.J. 2004). Walton contends that the doctors' position that there was no evidence that Dr. Moore himself was careless in placing the privileged document with the other materials to be produced is an insufficient reason to find the disclosure was involuntary. Walton asserts that Dr. Moore took no precautions to protect against the disclosure of the letter and did not take any steps to rectify disclosure until three years after he was first notified of the disclosure in November 2004. Walton argues that, under these facts, the doctors failed to carry their burden to show that the attorney-client privilege was not waived.

Additionally, Walton argues that the interests of justice require the letter to be admissible. Walton asserts that the December 1st x-ray and its interpretation were the most important pieces of evidence at trial, because Dr. Moore did not know if his notes were accurate regarding the most crucial x-

ray.  Walton argues that the circuit court erred by excluding the letter and allowing the jury to be misled.

### B.    The Doctors' Response

The doctors argue that the attorney-client privilege protecting the letter has not been waived, as the disclosure of the letter cannot be inadvertent if not made by a party to the privilege, in this case either Dr. Moore or his attorney. According to Dr. Moore, Mid-Atlantic and/or Smart Copy disclosed the letter in the course of the separate, independent workers' compensation case and, therefore, the disclosure can only be classified as involuntary.

The doctors, citing cases from other jurisdictions, contend that other courts have ruled that involuntary disclosure does not waive the attorney-client privilege when the party takes reasonable precautions to prevent the disclosure.  The doctors maintain that, like the proponents of the privilege in those cases, they did not cause the disclosure through their own actions or inactions.  The doctors assert that several individuals had access to the letter and all denied responsibility for its production.  The circuit court could not determine who disclosed the letter and, therefore, the attorney-client privilege remained intact.

The doctors argue that Dr. Moore took reasonable precautions to prevent disclosure.  In an affidavit by Dr.

Moore, he stated that his litigation materials were kept in a white three-ring binder with no numbers on the side, in contrast to medical records, which were kept in a manila folder with numbers on the side.  The doctors assert that Dr. Moore, by keeping the letter in a separate binder of a unique color, tried to ensure that his legal documents did not commingle with patient records, and that he cannot be held responsible for the unexplained production of the letter.

Moreover, the doctors contend that criminal activity or bad faith is not required for involuntary disclosure and, even if wrongdoing is required, the Mid-Atlantic employees and/or Smart Copy employees misappropriated Dr. Moore's personal documents. According to the doctors, Dr. Moore met his burden of proof because the undisputed evidence was that he and his attorney did not disclose the letter, and that either Mid-Atlantic or Smart Copy disclosed the letter, or the disclosure was otherwise unexplained.

Lastly, the doctors argue that the exclusion of the letter was harmless error because Walton did not assign error to the circuit court's grant of the doctors' motion in limine.  The doctors assert that the letter contained only expert opinion and retrospective critical analysis, but that Dr. Moore was not designated as an expert witness.

## C.   Analysis

As an initial matter, we hold that the disclosure of the letter was inadvertent, not involuntary, and that the circuit court erred as a matter of law in finding that the disclosure was involuntary instead of inadvertent.  There was no evidence suggesting that the letter was knowingly produced by someone other than the holder of the privilege through criminal activity or bad faith, and the doctors do not argue that any criminal activity or bad faith was involved.  All of the evidence indicates that the doctors mistakenly produced the letter, and therefore its disclosure was inadvertent, not involuntary.

The determination whether the disclosure was involuntary does not rest on the subjective intent of the doctors.  The doctors' intention to maintain the attorney-client privilege does not lead inevitably to the conclusion that the disclosure was involuntary instead of inadvertent.  If subjective intention of the proponent of the privilege controlled, a disclosure would always be considered involuntary.  However, in the waiver context, involuntary means that another person accomplished the disclosure through criminal activity or bad faith, without the consent of the proponent of the privilege.  See, e.g., In re Grand Jury Proceedings Involving Berkley and Co., Inc., 466 F.Supp. 863, 869 (D. Minn. 1979) (fired employee stole company's documents and disclosed them to the government); Resolution

14

Trust Corp. v. Clayton Dean, 813 F.Supp. 1426, 1430 (D. Ariz. 1993) (internal memorandum leaked to newspaper); Maldonado, 225 F.R.D. at 125-26 (letter from defendants to former attorney inexplicably found in plaintiff's mailbox).

"The inadvertent production of a privileged document is a specter that haunts every document intensive case." New Bank of New England v. Marine Midland Realty Corp., 138 F.R.D. 479, 479-80 (E.D. Va. 1991). Inadvertent disclosure of a privileged document includes a failure to exercise proper precautions to safeguard the privileged document, and does not require that the disclosure be a result of criminal activity or bad faith. For a disclosure to be considered inadvertent it is not required, as contended by the doctors at oral argument, that "an attorney or somebody on behalf of the client ma[de] a voluntary disclosure, in other words, they g[a]ve it up knowingly, but then they claim[ed] it was inadvertent, [claiming that] 'I made a mistake when I gave it up.'" While knowingly, but mistakenly, producing a document may be an inadvertent disclosure, unknowingly providing access to a document by failing to implement sufficient precautions to maintain its confidentiality may also result in an inadvertent disclosure.

Once the trial court determines that a disclosure of one or more communications is inadvertent, it must then determine whether the attorney-client privilege has been waived for the

items produced. In cases of inadvertent disclosure of a document protected by the attorney-client privilege, we adopt the multi-factor analysis set forth below, requiring the court to assess whether the holder of the privilege or protection took reasonable steps to prevent disclosure and promptly took reasonable steps to rectify the error.  This approach avoids the extremes, see New Bank of New England, 138 F.R.D. at 482, of an across-the-board rule of waiver when a communication has been produced, an approach often attributed to Dean Wigmore,[4] or a blanket "no waiver" rule which would hold that negligence by counsel or a producing party can never constitute waiver for lack of clear and intentional decision to waive protections. Id.

Under the standards we now adopt, waiver may occur if the disclosing party failed to take reasonable measures to ensure and maintain the document's confidentiality, or to take prompt and reasonable steps to rectify the error.  See id. at 482. This approach balances concerns of fairness and the fundamental importance of protection of the privilege long recognized in Virginia law "against the care or negligence with which the privilege is guarded."  Lois Sportswear, 104 F.R.D. at 105.

---

[4] See, e.g., New Bank of New England, 138 F.R.D. at 481, noting that the Wigmore approach held that the privilege should be treated as destroyed by any disclosure under a narrow

Under this approach, the following factors are to be included in the court's consideration: (1) the reasonableness of the precautions to prevent inadvertent disclosures, (2) the time taken to rectify the error, (3) the scope of the discovery, (4) the extent of the disclosure, and (5) whether the party asserting the claim of privilege or protection for the communication has used its unavailability for misleading or otherwise improper or overreaching purposes in the litigation, making it unfair to allow the party to invoke confidentiality under the circumstances. See, e.g., Koch v. Cox, 489 F.3d 384, 390 (D.C. Cir. 2007)(considering whether the party asserting privilege seeks to employ that privilege both as a sword and as a shield, and thereby to gain litigation advantage); United States v. Desir, 273 F.3d 39, 45 (1st Cir. 2001)(considering unfairness of allowing invocation of the privilege when a party testifies about portions of a communication or selectively asserts protections, because the "privilege cannot be used as both a shield and a sword"); United States v. Workman, 138 F.3d 1261, 1263-64 (8th Cir. 1998). Thus, there may be "a determination that the privilege holder's conduct makes it unfair to allow subsequent assertion of the privilege." United States v. Yerardi, 192 F.3d 14, 18 (1st Cir. 1999)("Probably the

construction of the privilege that emphasizes that confidentiality is an exception to the general duty to disclose.

17

most common example is a privilege holder's effort to answer some questions in a subject area (usually those that serve the privilege holder's interests) but not others (those that harm the privilege holder's interest). Such a pick-and-choose approach may seem unfair in general or because it distorts the evidence that is presented to the factfinder"). See Developments in the Law – Privileged Communications, 98 Harv. L. Rev. 1450, 1629-31 (1985).

None of these factors is independently dispositive, and the court must also consider any other factors arising from the posture of the case at bar that have a material bearing on the reasonableness issues. Applying the relevant factors in this case to determine whether the disclosing party took reasonable measures to ensure and maintain the allegedly privileged document's confidentiality, and took prompt and reasonable steps to rectify the error, we hold that the doctors waived the attorney-client privilege attached to the letter. Upon consideration of the record as a whole, we conclude that the doctors failed to take reasonable measures to ensure and maintain the confidentiality of the letter. We will analyze each of the five primary factors in turn. Our analysis takes into consideration Dr. Moore's actions, as well as those of Mid-Atlantic, as the practice group to which Dr. Moore belonged and with which he rendered medical treatment to Walton. We also

18

give deference to the circuit court's findings of fact made during the second hearing on the doctors' motion for a protective order against use of the letter.  The Daily Press, Inc. v. City of Newport News, 265 Va. 304, 309, 576 S.E.2d 430, 432-33 (2003).

### 1.    Reasonableness of Precautions

We first consider the reasonableness of Dr. Moore's precautions to prevent an inadvertent disclosure of the letter. As the holder of the attorney-client privilege, Dr. Moore was charged with the responsibility to take reasonable precautions to safeguard the letter and to preserve its confidentiality.

Regarding the care exercised to ensure the letter was not disclosed, Dr. Moore "kept it in a separate notebook, and he kept it in his office."  The separate notebook was a white binder without numbers, whereas medical records were kept in a manila folder with numbers.  However, Dr. Moore also kept medical records in his office.  The notebook was not marked privileged or confidential, nor was the letter itself marked privileged or confidential.  The number of documents to be reviewed before release was not extensive.  There were no time constraints in responding to the discovery request that would have precluded a review of what was produced.

Neither the doctors nor their counsel conducted a privilege review of the documents gathered by Smart Copy.  In fact, there

was no evidence presented regarding any procedure for reviewing documents before they were copied by Smart Copy. Dr. Moore could have insisted upon additional review, such as after the documents were copied by Smart Copy and prior to their production. See Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc., 116 F.R.D. 46, 51 (M.D. N.C. 1987).

When a party utilizes an independent copy service like Smart Copy for purposes of document production, it is especially important to clearly mark documents intended to remain confidential to avoid commingling such documents with documents that are properly subject to discovery. The doctors did not establish that they took sufficient efforts to supervise the Smart Copy employees or to prevent intermingling of the letter with unprivileged, non-confidential documents. We therefore conclude that the doctors failed to take reasonable precautions to prevent an inadvertent disclosure of the letter.

## 2. Time Taken to Rectify Error

There is some dispute as to when the doctors were notified that the letter had been produced. Walton contends that the doctors were informed that the letter had been produced during the workers' compensation case in November 2004. Regardless, the doctors were again notified, in June 2006, that the letter had been produced to Walton's attorney through Walton's answer

20

to Interrogatory 11.  In her answer, she refers specifically to a letter dated October 30, 2001, authored by Dr. Moore, which was produced during the workers' compensation case, and which she "consider[s] to be an admission or otherwise probative of liability."  Both parties agree that Walton's attorney contacted the doctors' attorney in October 2007 regarding the proposed use of the letter, but the doctors argue that they had not previously been notified that the letter had been disclosed. The doctors filed their motion for a protective order in November 2007.

Based on the information conveyed in Walton's answer to Interrogatory 11, the doctors should have inquired into the whereabouts of the letter in question and attempted to rectify any potential error in its disclosure.  A year and a half passed between service of the answers to interrogatories to the doctors and their filing of a protective order.  Even in October 2007, the doctors did not take immediate measures to secure its return and to protect the privilege.  Instead, the doctors allowed a month to lapse before seeking relief from the circuit court in the form of a protective order.  The doctors should have taken immediate action to attempt to maintain the privilege attached to the letter.[5]

_____

[5] See, e.g., the recent amendment to the Part Four Rules of Court adding Rule 4:1(b)(6)(ii), setting up a notice procedure

### 3.    Scope of Discovery

The doctors do not contend that the discovery in this case was extensive or involved a massive exchange of documents.  Also lacking was any evidence of time constraints or of any other factor impeding the doctors' ability to monitor the documents being produced.  Because the discovery was not expedited or extensive, the doctors are given less leeway regarding their precautions to ensure the letter was not disclosed.

### 4.    Extent of Disclosure

The disclosure of the letter was complete, because it was disclosed not only to Walton, but also in the workers' compensation case to the attorney for Walton's employer, and there is no indication that the document has not been copied, digested, and analyzed.  The circuit court found that the privilege was permanently destroyed, so that disclosure cannot be cured simply by a return of the document.

### 5.    Interests of Justice

---

available when "a party believes that a document or electronically stored information that has already been produced is privileged or its confidentiality is otherwise protected," halting use and dissemination of the document and providing an opportunity to obtain judicial determination.

We also note that the General Assembly has enacted a new Code § 8.01-420.7 in its 2010 session, which adopts, effective July 1, 2010, provisions that implement the standards articulated in this opinion to govern, inter alia, inadvertent waiver of the attorney-client privilege and work product doctrine confidentiality protections.  See 2010 Acts ch. 350.

22

Lastly, we consider whether, by asserting the claim of privilege as to the letter, the doctors used its unavailability for a misleading or otherwise improper or overreaching purpose, making it unfair under the circumstances to allow the doctors to invoke confidentiality. Waiver of the attorney-client privilege should not be found in every instance in which upholding the protections of confidentiality or privilege may unfairly become an obstacle to the truth, because such an expansive view of waiver would defeat the salutary purpose of the attorney-client privilege. However, parties should not be permitted to use the privilege as both a shield, preventing the admission of evidence, and as a sword to mislead the finder of fact by allowing evidence that would be impeached by the privileged information if it had not been suppressed.

We hold that this factor also tips in favor of Walton. By ruling that the disclosure was involuntary and that the privilege attached to the letter had not been waived, the circuit court allowed the doctors' counsel to engage in questioning that had significant potential to mislead the jury. Although framed as a question about what Dr. Moore wrote in his December 1st note, Dr. Moore's answer led the jury to believe he had reviewed the December 1st x-ray when the suppressed letter may have impeached him by demonstrating that he may instead have mistakenly reviewed the November 24th x-ray. The issue of which

x-ray Dr. Moore reviewed was a question of fact and a key to Walton's claim of negligence, and did not require either an expert opinion or retrospective critical analysis.

Applying these five factors to the circumstances surrounding the inadvertent disclosure of the letter, we hold that the doctors did not fulfill their burden to prove that the attorney-client privilege was not waived with respect to the letter. While the attorney-client privilege serves a very important function in the administration of justice, it is subject to waiver, and the holder of the privilege is responsible for exercising reasonable caution to ensure that the privilege remains intact. For the proponent of the privilege to enjoy the benefits of the privilege, he or she must also bear the burden of taking sufficient measures to safeguard privileged documents. Such measures were lacking in this case. Therefore, the circuit court erred in ruling that the privilege was not waived.

CONCLUSION

For the reasons stated, we will reverse the judgment appealed from and remand the case to the circuit court for further proceedings consistent with this opinion. Our decision renders the doctors' harmless error argument moot.

Reversed and remanded.